SAN  ANTONIO  v.  NATHANIEL  LEWIS.

SAN  ANTONIO  v.  BRYAN  CALLAGHAN.

Where the local authorities of the city of San Antonio de Bexar, in 1808 and 9,
  with the approbation of the Governor of the Provinces of Coahuila and Texas,
  for the purpose of improving the shape of the main plaza, and of raising money
  to repair the public buildings, and reciting His Majesty's Royal Ordinance of
  1786, as authority therefor, sold a part of the plaza, but there was no actual in-
  terruption of the use of said part by the public until 1847, an action by the city
  to have the buildings erected thereon by persons claiming under the sale made
  in 1808 and 9, removed as nuisances, the title papers annulled, &c., was sus-
  tained.
It seems that where a jury is waived in the Court below, and there is a statement
  of facts, it is not a right of the appellee, in any case, if the judgment be re-
  versed, to have the case remanded.

Appeal from Bexar.  These suits were commenced April
27th, 1852.  The proceedings which eventuated in the sale to
Zambrano, were as follows:  Petition by Fernandez Veramen-
di, Syndic Procurador of San Antonio de Bexar, June 3rd,
1808, ("in the discharge of one of the sacred duties imposed
"upon him by his office, in promoting all that may concern the
"improvement and aspect of the Town, the repairing of the
"public works which are fast going to decay, and the finding
"of the means to defray the expenses which may be incurred,
"without burthening the public,") to Cordero, Governor of the
Province, representing that "the principal plaza of this Town,
"being of an imperfect shape, may be improved, reducing it to
"an almost perfect square, by drawing a line from the alley of
"the Royal Buildings to that formed by the Church and the
"house of Galan;" that the sale of the part so cut off "will
"produce an effective sum, and it may immediately be applied
"to the repairing and improvement of the Palace of the Gov

" ernment and the Royal Buildings, and, should there be a sur-
" plus, to other public objects."

Ordered by Cordero to be referred to the Ayuntamiento,
June 9th, 1808.

Approbation of the Ayuntamiento, June 10th, 1808. De-
cree by Cordero : Having seen and examined the foregoing
plan proposed by the Syndic Procurador, to perfect the figure
of the square called the "De Villa" of the Town ; the report
of assent of the Ayuntamiento ; and finding it all in conformity
with the provisions of His Majesty in his Royal Ordinance of
1786 concerning the improving of the aspect of the settlements,
particularly when said object is going to be obtained in the
proposed improvement of said plaza, without the least burthen
to the public or to private persons ; but, on the contrary, with
known advantage to both, I approve of the laying off of the
block proposed by the Syndic Procurador, and the sale of its
ground in favor of private persons who may wish to buy it ;
commissioning, for the purpose of effecting said sale in due
form, at public auction, the Alcalde of the first Vote of this
Capital, Don Ignacio Perez, in order that with the knowledge
and co-operation of the said Syndic Procurador, he may strike
off the ground of said block in favor of the best bidders. Let
him make out the necessary papers, giving gratis to the inter-
ested parties the testimonials required for them, and deposit in
the coffers of the Government the sums procured by said ope-
ration, destined to the objects proposed by the Syndic Procu-
rador. I, the Military and Political Governor of the Prov-
inces of Coahuila and Texas, Colonel of Cavalry of the Royal
Armies, D. Antonio Cordero y Bustamente, thus provide, order
and sign, with the witnesses in my assistance, acting by depu-
tation in the absence of a Notary, there being none in the
terms provided by law, &c. (Signed and witnessed.)

June 11th, 1808, publication for sale of said block, being
sixty-six varas by thirty-eight, at a minimum of $15 per vara.

June 24th, 1808, was made the last solemn proclamation of

sale and the only bidder, the Sub-Deacon Don Manuel Zambrano, not having presented in cash the amount of his bid, which was $15 for each vara, "in order to better the sale, the adjudication was not made."

February 3rd, 1809, after several efforts to obtain a larger price by publication of the sale, the property was adjudicated to Zambrano, he having re-iterated his original bid, which amounted to $990. Reported to the Governor same day.

Bexar, February 9th, 1809. Having seen the proceedings, I approve the adjudication of the land above mentioned, to the aforesaid Sub-Deacon ; and, provided he offers to build it up immediately, let the proper documents be made out by the proper Tribunal, and possession given of it, giving the interested party a moderate time to pay the total amount, notifying him that in not complying with the offer, he will lose the ownership of what he has bought. SALCEDO.

Then followed the notification to Zambrano, February 14, 1809, that his offer had been accepted ; he was given until the arrival of the Captain of Militia, Don Jose Maria Lada, for the payment of $500, and all the month of the next June for the payment of the balance, $490 ; "and his offer being ad-"mitted, he was notified to proceed immediately to building ;" and that in case he failed in the payment of the sum in the "terms expressed, or in building, which he must do without "delay, he will lose the right and interest which he at present "has acquired ; and having consented to all the provisions, he "prayed that the title of possession should be made out," &c.

Then followed a deed dated February 15th, 1809, referring to the terms of the preceding act, and putting said Zambrano in possession and extending title in the usual form, containing an express provision that he should not be dispossessed without being first heard and by law and right evicted. Deed approved by Governor Salcedo same day. February 25th, 1809, the $500 was paid ; June 21st, 1809, the $490 was paid.

The deed referred to in the Opinion as having been made

by the brother of Zambrano, was a deed passed before ———— Zambrano, Primary Judge, and called to front on the public square, which, from the situation of the ground, it could not do if the land now in controversy were private property. The defendants proved by the same witnesses by whom the plaintiffs proved that the land in controversy had been used by the public in the same manner as other parts of the public plaza, from 1813 till the time defendants began to build on it; that during same period it was known and spoken of among the old inhabitants, as the property of Nadre Zambrano.

*I. A. & G. W. Paschal,* for appellants.

*J. Denison,* for appellees.

LIPSCOMB, J.  These two suits were argued together, both presenting precisely the same points, and the statement of the facts in the two cases being the same. The prominent facts are, that the city of San Antonio, as originally laid out, had two plazas, or squares, dedicated to the use of the public; one a main plaza and the other a military plaza. The land, the subject of the controversy, it is admitted was originally a part of the main square, or public plaza, and was so constantly used and enjoyed by the people, from the time of the foundation of the city to the years 1808 and 1809, until the proceedings were had under which the defendants claim title. These proceedings show that at the last date the public authorities cut off a portion of the north side of the main plaza, so as to reduce it from an oblong to nearly a square, and caused the portion so cut off to be sold for nine hundred and ninety dollars, to Juan Manuel Zambrano. The terms of the approval of the decree of sale to Zambrano, are expressed as follows, i. e.: " Provided he offers to build it up immediately, let the proper " documents be made out by the proper tribunal and possession " given of it, giving the interested party a moderate time to

"pay the total amount; notifying him that in not complying "with the offer, he will lose the ownership of what he bought." Signed, Salcedo. The documents prove the payment of five hundred dollars, and a short credit for the balance, four hundred and ninety dollars. There was no improvement made until 1813, when Zambrano had a quantity of rock and sand put on the ground for building a house; these materials were shortly after removed by the soldiers, for the purpose of barricading the streets; no further effort was made to build upon the ground by Zambrano, who was a priest, and died in 1824. In 1837 Van Ness obtained letters of administration on the estate of Zambrano, and on the 30th September, 1839, a general order was made to sell so much of the estate inventoried as should be necessary to pay the debts. No notice was given to present debts until 1839. There was a deed given in evidence, made by the brother of Zambrano, and one of his heirs, not for the grant in controversy, but for other land, showing that the heir recognized the old boundaries of the plaza as still existing in 1835, and the evidence all conduced to prove that the possession of the inhabitants of the whole plaza, as originally laid out, continued uninterrupted until the defendants built upon the ground, Lewis late in August or early in September, 1847, and Callaghan about five months later. This suit was brought by the corporation to recover the possession and to abate the nuisance. The defendants pleaded the different Acts of three, five and ten years, and a possession of forty years. But the evidence is clear, that the people of the city used it as a public square, without any interruption, until the use thereof was interrupted by the defendants. A jury being waived, judgment was awarded by the Court for the defendants, and the plaintiff appealed.

The first question we propose discussing, is the right acquired by Zambrano, under the sale sanctioned by Governor Salcedo, in 1809. If Salcedo had no authority to sell a part of the commons that had been dedicated to the public use,

Zambrano acquired no title under such illegal exercise of authority.   This was one of the points discussed by this Court in the case of Lewis and others v. The City of San Antonio, (7 Tex. R. 288,) and this Court, following the Supreme Court of the United States in the case of New Orleans v. The United States, (10 Peters. 734,) held that it was not competent for the local authorities to sell land so dedicated to public use, and we quote from the opinion of Judge McLean, in the case above cited, the following:  " This power was not exercised by the " King of France, and the exercise of the power of the Spanish " Governor, in the instance stated, was in violation of the laws " of Spain, and equally against its usages.   The land, having " been dedicated to public use, was withdrawn from commerce; " and, so long as it continued to be thus used, could not be- " come the property of any individual.   So careful was the " King of Spain to guard against the alienation of property " which had been dedicated to public use, that in a law all " such conveyances are declared to be null and void ;" and we recognized the law to which the Judge referred to be L. 1, B. 7, Tit. 16, Novissema Recopolacion.   From the evidence it appears that the enjoyment of the use by the public at large was never interrupted by the sale to Zambrano ; he never built upon the ground, and consequently there was no interruption of the use, that could have called upon the town to assert its rights.   Had Zambrano gone into the use of the ground under his purchase, excluding others from the enjoyment, and been permitted so to have continued in the adverse possession for a long period of time, it is believed that such adverse possession would have matured into a right, to which the rights of the corporation would have had to yield.   The possession of the use does not appear ever to have been interrupted until the possession taken by the defendants.   The hauling of stone upon the ground by Zambrano in 1813 could not be regarded as an interruption, unless it had been shown that the enjoy- ment of the use of the public square or common was thereby impeded or encroached upon.

But suppose the continuity of the possession had been then broken, and the date of the use would not go back beyond that time, and commenced with the removal of the obstructions that had been placed on the ground, we would then find that it had been continued for eleven years during the life of Zambrano, and continued on until interrupted by the defendants in this suit, it would give about thirty-four years uninterrupted possession of the use, which would give more than sufficient time to establish a use.

The three years possession could not bar the plaintiffs right of action, because they do not show title derived from the sovereignty of the country, and five years had not run when the suit was commenced.

The judgment is reversed and this Court proceeds to render such judgment as the Court below should have rendered.

Reversed and re-formed.