CITY OF TYLER ET AL V. SMITH COUNTY ET AL.

No. A-3294. Decided January 16, 1952.
Rehearing overruled March 12, 1952.
(246 S. W., 2d Series, 601.)

*Lasseter, Spruiell, Lowry, Potter & Lasater* and *Charles F. Potter*, all of Tyler for Petitioners, Dr. Woldert and those represented by him.

*Troy Smith* and *Ted Chilcote*, both of Tyler, for petitioner, City of Tyler.

The Court of Civil Appeals erred in holding that the property involved in this suit had not been dedicated as a "Public Square," and also in holding the sole and unconditional owner was Smith

County. Lamar County v. Clements, 49 Texas 347; State v. Travis County, 85 Texas 435, 21 S. W. 1029; Ramthun v. Halfman, 58 Texas 551.

*Weeks & Hankerson,* of Tyler for respondents, Smith County.

The lower courts properly held that Smith County was the sole and unconditional owner of the property herein involved, subject to the easement of the City of Tyler in the Streets designated; that said property had not been dedicated as a public park for general public use; that it had only been dedicated for courthouse and jail purposes; and that said county had a right to sell same and none of the petitioners had vested rights therein. Oswald v. Grenet, 22 Texas 99; Adams v. Rolwes, 149 Texas 52, 228 S. W. 2d 849; Hay v. Cunningham, 77 S. W. 2d 1057.

Mr. Justice Brewster delivered the opinion of the Court.

This is a suit for a declaratory judgment relating to the square in the City of Tyler, filed by Smith County et al., respondents, against the City of Tyler and as a class suit against Dr. Albert Woldert et al. representing two classes of defendants: (1) those owning property continguous to the square and (2) those owning property within the original 100-acre townsite, petitioners. A trial court judgment for respondents was affirmed by the Court of Civil Appeals, Associate Justice Williams dissenting. 240 S. W. 2d 496.

The dispute is between Smith County, the City of Tyler and the individual property owners, as to their respective rights in the square. Smith County contends that it owns the square, on which its courthouse is located, in fee simple, hence can move the courthouse and sell the square to anybody it chooses. The City of Tyler asserts a fee simple title to the square except as to the streets platted and actually used on the four sides thereof. The individual lot owners claim that the square has long been dedicated as a public square for the use of the public and cannot be diverted to private uses. The effect of the judgments below is to sustain the contention of Smith County, except for an easement in the City of Tyler for street purposes in that part of the square now occupied by the four streets surrounding it.

By statute effective April 11, 1846, the legislature created Smith County. It named one James Hill and four others as commissioners to mark the county lines and corners, to locate the county "site" and to purchase or receive by donation 300 acres

of land for the site or, in the absence of sale or donation, to condemn 100 acres "and proceed to lay off a town, and to sell the lots thereof to the highest bidder, reserving lots for a courthouse, jail, and such other public lots as they may deem necessary." Gammel's Laws of Texas, Vol. 2, p. 1361.

On Feb. 6, 1847, one Pollit conveyed to Hill, "attorney in fact for Commissioners appointed to select and locate the Town of Tyler," 100 acres of land "for the use and benefit of the said Town of Tyler, * * * forever in fee simple * * * To have and to hold said tract or parcel of land for the use and benefit of the Town of Tyler * * *."

Before this deed was executed, Hill, for the Commissioners, had surveyed the 100 acres; and his field notes, dated October 1, 1846, appear in the record. Following his signature is this notation: "The center of the public square begins from the N.W. cor. of said 100 acre survey South 78 deg. 28 East 20.15 chains dist. A. H. Martin Clerk of the County Court." However, neither the reason for this notation nor the authority of the clerk to make it is shown.

On Apr. 18, 1849, Hill and the other commissioners executed to one Ochiltree a deed to Lots 1 and 2, in Block No. 2, "in the plat of said town of Tyler," reciting that grantee had been highest bidder at auction held on Dec. 21, 1846. That plat here referred to, however, has not been found.

There were three more acts of the legislature relating to the matters under review. On Feb. 26, 1848, Hill et al., commissioners, were directed to sell the remainder of the lots in the City of Tyler and apply proceeds to the completion of a courthouse and jail. Gammel's Laws of Texas, Vol. 3, p. 37. By act of Jan. 29, 1850, the Commissioners were directed to make to the County Court of Smith County "a correct statement of their proceedings, the number of lots which have been sold, the amount received for said sales, and the amount paid out by said Commissioners and for what purposes expended"; and they were required to make bond for double the probable amount in hand. Ibid., p. 483. The third act, passed Jan. 29, 1850, incorporated "the town of Tyler, in Smith County." Among other things, it provided that the "limits of said corporation shall extend over one hundred acres in a square, laid off so as to have the *public square* of said town of Tyler in the Center of said corporation limits." Ibid., p. 60, 61. (All italics in this opinion are ours.)

In April, 1854, a map of the Tyler townsite of 100 acres was filed for record in Smith County, but the date when it was drawn is not shown. It shows the lots and blocks and the bounds of the square in dispute; but there is nothing on the map to designate the nature, ownership or use of the square.

Nov. 21, 1855, the Commissioners Court of Smith County passed an order that "J. C. Hill be required to survey the *public square* in the Town of Tyler." This Hill did; and his field notes, dated Feb. 23, 1856, and recorded July 4 or 5, 1856, read as follows: "Field notes of the *public square* of Tyler, Smith County. I commenced to survey the square 6 in. East of the centre of the present court house at the Original Rock placed there at the commencement of said town. Thence I run from said Beginning North and South 200 feet and East and West 350 feet that makes the square 400 feet North and South and 700 feet East and West including the centre street 90 feet wide and the 4 streets bounding the square each 50 feet wide all the balance of the streets is 50 feet wide." Then, after describing the lots and blocks in the 100 acres by metes and bounds, the notes conclude: "The above Blocks and Lots is all numbered on the map of said town accompanying these field notes as also the streets with their width and names." (This map has not been found.) After Hill's survey had been made, the Commissioners Court on May 21, 1856, ordered that one Douglas "be required to have four rocks put up on the *public square* one at each corner of the square," and as a part of this order the Court directed the County Clerk to record "the field notes of the *public square* of the town of Tyler" which Hill had made.

On May 24, 1851, the Commissioners Court of Smith County "ordered and decreed * * * that a court house be built and erected on the centre of the *public square* in the town of Tyler * * *." This was after an order on August 22, 1948, had directed "that the court house now standing on the *public square*" be sold at public auction.

And 56 years later, on Jan. 2, 1907, by order of the Commissioners Court, Smith County entered into a contract with the City of Tyler and adjoining property owners to pave "around the *public* square of said City of Tyler a distance of fifty feet extending out from the sidewalk into the *public square* for said distance of fifty feet." Again, five years later, on July 9, 1912, the Commissioners Court agreed with the City of Tyler to

widen and pave the streets on the east and west ends of the *"public square"* 30 feet.

On August 22, 1854, the Commissioners Court appointed "a committee to purchase materials for painting the enclosure around the Courthouse." This "enclosure" was an iron paling fence which extended from four buildings, one off each corner of the courthouse, so as to contain all five buildings, with the courthouse in the center and with a gate through the fence on all four sides. At one time the Court of Criminal Appeals occupied one of these buildings while the other three were used by the county tax collector, the county superintendent and the county judge, respectively. Thus were the courthouse and its associated buildings segregated from the much larger part of the "square." That the county considered it as so set off is established by the fact that when the Commissionners Court ordered construction of two of them it directed "said buildings to be built one in the northeast and one in the southwest corner of the *courthouse yard* equal distance from the Courthouse."

With the courthouse and other governmental buildings so enclosed from the remainder of the square, the record shows numerous uses made of the remainder which are wholly unrelated to a court or other governmental use. For example, it was used for years as a market place, where farmers sold their cotton, corn and other farm products, garden truck, wood and the like. One witness said that farmers from Smith, Henderson and Van Zandt counties "would bring their cotton here and I have seen thirty to forty cotton wagons; cotton buyers swarmed over it, filled it up." That the county intended that it should be so used is proved by an order of the Commissioners Court granting to the "citizens of Tyler" the privilege "to build a market house on the *public square* in said town" and donating $20 provided the building cost as much as $200.

Moreover, the public have used it freely otherwise. A photograph in the record shows a portion of the square on a busy day in Tyler; and the square is completely covered by hundreds of buggies and wagons and teams—a free parking lot.

A band stand was built on it and used for the entertainment of the public. Benches were constructed about the square for public use. Preaching services and political meetings were conducted there. For at least two years the county fair was held on the west end of the square. There was a "public well for the

public generally to draw water from and for their stock." A former county judge testified, without dispute, that the portion of the park outside the enclosure which was around the courthouse was generally used in the manner and for the purposes above recounted, while that portion inside the enclosure was generally used for "the court house purposes and general seat of the County Government."

The facts stated are not controverted, so it is a question of law whether they show such dedication of the plot in controversy as a public square for the general use of the public as that it cannot now be diverted to private use as contended for by the County and City.

1 Quoting from an earlier case, this court long ago said that the act of throwing open property to public use, without any other formality, is sufficient to establish the fact of a dedication to the public; and if individuals, in consequence of this act become interested to have it continue so, as by purchasing property, the owner cannot resume it. Oswald v. Grenet,, 22 Texas 94. And see Adams et al v. Rowles, 149 Texas 52, 228 S. W. 2d 849.

There was never any express dedication of the square in controversy as a public square, so our problem is to determine whether the record shows a dedication by implication, which is said to be analogous to the doctrine of estoppel *in pais*. 26 C.J.S., Dedication, Sec. 2, p. 50. In order to establish such a dedication there must have been a clear and unequivocal intention on the part of Smith County to devote the square to public use and an acceptance by the public. Oswald v. Grenet, supra. We have concluded that such dedication is shown in this case.

There seems to be a well defined distinction between *court-house square* and *public square*. For instance, in State v. Travis County, 85 Texas 435, 21 S. W. 1029, there were many lots and blocks in the City of Austin which belonged to the Republic of Texas when the city site was originally platted. Some of them were reserved for public uses, and an agent of the Republic marked them on the map designating the particular public use to which each was to be devoted. The north half of a certain block was marked "Courthouse" while the south half was marked "Jail." Some time later Travis County erected both a courthouse and a jail on the places indicated. In 1876 this site was abandoned and a courthouse and jail were erected on other

lots. The county then rented the old block for use by a lumber yard and later filed suit for rents due. The state intervened, claiming title to the block. This court held that the block having been dedicated to the limited purpose of a courthouse and jail site and that use having been abandoned, the block reverted to the state. But in course of the opinion it was said: "If the land had been dedicated unqualifiedly to public uses—if, for instance, the words 'Public Park' had been written upon the plat instead of the words 'Courthouse' and 'Jail,' we think the public, as well as the purchasers of adjacent lots, would then have acquired rights in the property beyond the power either of the state or county to divert or affect."

2  If "public park" written on a plat means a dedication for a much broader use than as a site for a courthouse and jail, the public's right to which use is not lost by an abandonment of the courthouse and jail use, we see no reason why the repeated and uniform use by the Commissioners Court of Smith County of the phrase "public square" in referring to the property in controversy should not be given significance broader than mere use as the site for a courthouse, that broader significance given by this court, for instance, in Lamar Co. v. Clements, 49 Texas, 347. As stated above, in 1848, just two years after Smith County was organized, the Commissioners Court ordered sale at public auction of the courthouse then on the "public suare." In 1851 they ordered a new courthouse to be erected on the "public square." In 1855 they ordered J. C. Hill to survey the "public square;" and, after Hill had made his field notes of the "public square," the court ordered that Douglas put up rocks at each corner of the "public square" and that the county clerk record Hill's field notes of the "public square." That this early-day concept of the scope of public use of the square was shared by later governing bodies of Smith County is shown by the order of the Commissioners Court in 1907 authorizing paving around the "public square" and that in 1912 widening the streets on the east and west ends of the "public square." On the other hand, not a single order of the Commissioners Court is shown which indicates that that body ever regarded the square as anything less than a public square. But there are other orders which show that it was regarded as being devoted to more uses than as a courthouse square. We refer to the fact that in 1854 the court ordered the painting of iron paling fences then enclosing the courthouse and the appurtenant four buildings—one off each corner of the courthouse—from the rest of the square, and to the fact that as to two of these appurtenant buildings the court

ordered one built in the northeast and the other in the southwest corner of the *courthouse yard.*

We think these facts show unmistakably that from its very beginning Smith County never did intend that the square would be restricted to courthouse purposes and uses but did intend that courthouse use would be but one of the general public uses to which it was to be dedicated and devoted.

There can be no doubt that the public accepted the dedication. They used it as a market place, as a parking place, as a place for entertainment and rest, as a place for preaching services and political meetings, as a place to get water for themselves and their stock, and according to undisputed testimony, they use it today as a "place of enjoyment and rest," "to enjoy the roses, shrubbery and various landscaping that has been put there." According to the weight of authority, this establishes acceptance, and we so hold. 16 Am. Jur., Dedication, Sec. 35, p. 383.

**3** Under these undisputed facts evidencing dedication and after more than a century of unquestioned general public use following and accepting such dedication, it cannot justly be said that Smith County can now convert the square to private use. Of course, the county may abandon the present square as a site for a courthouse and build a new courthouse wherever it chooses; but if it elects to do that, the entire square must remain impressed with the right of the public to use it for general public purposes; it cannot be diverted to private uses. Lamar Co. v. Clements, 49 Texas, 347, supra.

The fee simple title to the square, as well as its management and control consistent with this opinion, will remain in Smith County. Lamar Co. v. Clements, supra.

**4** What we have said necessarily disposes of the claims asserted by the City of Tyler, except its assertion of an easement in a strip 90 feet wide running north and south through the center of the square for street purposes.

That claim is based wholly on the field notes of the square made by J. C. Hill on Feb. 25, 1856, above quoted, in which he recites, "that makes the square 400 feet North and South and 700 feet East and West *including the centre street 90 feet wide* * * *." Although the county did order these notes recorded, there

was never any other act indicating any intention to dedicate a street across the square. On the contrary, the courthouse was then, and has ever since remained, on the very 90 feet described. Therefore, we hold there never was any dedication of the 90 feet to street purposes, as claimed by the city.

It follows that the judgments below are reversed. Judgment is here rendered that Smith County take nothing, except as otherwise indicated in this opinion, and that the City of Tyler take nothing except its admitted easement in the four streets now bounding the square. Otherwise judgment is rendered for petitioners, Dr. Albert Woldert et al., the individual lot owners, and the classes they represent.

Reversed and rendered.

Delivered January 16, 1952.

ON REHEARING.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Both Smith County and the City of Tyler have filed motions for rehearing. We have concluded that they should be, and they are, overruled.

**5** However, the County makes this point: "We respectfully submit this Honorable Court should clarify in its declaratory judgment the respective rights as to opening the 90-foot street through the tract, so as to connect the two ends of Broadway, when and if the courthouse is moved and does not occupy any portion of said 90-foot area." Although the fear is expressed that we may have so held, the County says: "We do not believe this Hororable Court intends for the language used in its opinion to mean that no such street can ever be opened under any circumstances." That belief is well founded, as there is nothing in our original opinion which is fairly susceptible of being construed as holding that Broadway cannot ever or under any circumstances be extended through the public square when and if the courthouse is moved to some other part of the square or elsewhere "and does not occupy any portion of said 90-foot area."

Tyler is a home-rule city. Under the provisions of Art. 1175, Sec. 15, Vernon's Anno. Civ. Stat., it has the right of eminent

domain "to appropriate private property for public purposes whenever the governing authorities shall deem it necessary * * * for any of the following purposes: * * * streets * * *. The power of eminent domain hereby conferred shall include the right of the governing authority, when so expressed, to take the fee in the lands so condemned and *such power and authority shall include the right to condemn public property for such purposes."* (Italics ours.)

This question is discussed pro and con in Central Land Co. v. Grand Rapids, 302 Mich. 105, 144 A. L. R. 478, 4 N. W. 2d 485, and in the Annotation thereto, particularly in Anno. III a.

If counsel will refer to Kingsville Independent School District et al. v. Crenshaw et al. (Civ. App.), 164 S. W. 2d 49, (error dismissed, cor. judgt.) they will find how the desired result may be accomplished even without resort to condemnation proceedings.

Motions for rehearing overruled.

Delivered March 12, 1952.