H. B. ZACHRY, TRUSTEE v. CITY OF SAN ANTONIO

No. A-6160. Decided June 5, 1957.
Rehearing overruled October 9, 1957.
(305 S.W. 2d Series 558.)

552

*Carl Wright Johnson, Lang, Byrd, Cross & Ladon, Sylvan Lang, Bernard Ladon, Johnson, Hite & Callender, Chester H. Johnson, Sidney D. Callender,* all of San Antonio, *Looney, Clark, & Moorehead* and *R. Dean Moorehead,* all of Austin, for petitioners.

*Carlos C. Cadena,* City Attorney of San Antonio, *Hollers &
O'Quinn and Truman O'Quinn,* of Austin for respondents.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

This is a suit by respondent, hereinafter called City, against
petitioner, hereinafter called Zachry, to cancel and set aside as
void a lease contract entered into between City and Zachry on
October 15, 1953 pursuant to an ordinance duly passed by the
Council of City. By the contract City purported to lease to
Zachry for a period of 40 years the right to construct and op-
erate an underground parking garage beneath Travis Park in
the City of San Antonio. Upon a trial before the Court, judg-
ment was rendered setting aside and canceling the contract
and refusing Zachry any recovery on his cross action against
City. Upon appeal this judgment was affirmed. 296 S.W. 2d 299.
We affirm the judgment of the Court of Civil Appeals.

Shortly after the contract was entered into between the City
and Zachry, Mrs. Rena Maverick Green et al filed suit in the
nature of trespass to try title alleging that they were the heirs

of one Samuel A. Maverick, who, more than 100 years prior to suit, had dedicated the land upon which Travis Park was located for the use of the public as a public park or square; that the dedication was made in such manner that the park would revert to dedicator, his heirs and assigns, should the land cease to be used as a public park; that the lease between City and Zachry constituted a use of the park contrary to the purposes for which it had been dedicated, and, therefore, title had reverted to Mrs. Green et al. Final judgment was rendered against Mrs. Green in favor of the City as the owner of the fee simple title to Travis Park. 282 S.W. 2d 769, wr. ref., n.r.e.

In that suit the City made common cause with Zachry in upholding the lease contract herein sought to be set aside by the City. Also in that case the Court said: "* * * It is admitted by both sides that Travis Park has been maintained as a city park by the City of San Antonio for approximately one hundred years, and thus there can be no issue as to whether the subject property has been dedicated to park purposes. * * *" In our present case it was stipulated "that the land now known as Travis Park has been maintained by the City of San Antonio as a plaza, square or park for more than one hundred (100) years next preceding the institution of this suit." The evidence shows it has been used as a park and was being so used at the time of the trial of this cause.

In executing and enacting the ordinance and lease contract involved in this suit, the City Council made a number of findings of facts. Generally speaking, the findings of fact have to do with the crowded traffic conditions of the San Antonio streets in the vicinity of Travis Park; the necessity for off-street parking facilities as a protection to the lives of the City's citizens, and also to assist the City's civilian defense plan. The City Council also found "that the subsurface of Travis Park is useless and unusable as a public park and there is no immediate prospect of any use for such subsurface in the foreseeable future, and is of no value to the City in its present state and will continue to have no value unless it can be used as an underground or off-street parking facility; that the construction, operation and maintenance of an automobile parking garage in the subsurface area of the park will not materially interfere with or be inconsistent with the use of the surface area by the public as a park," since in the proposed plan of construction the "park will be restored and its beauty enhanced."

The trial court filed what is denominated as its "District

Court's Holding." Among other things, he stated that the City held fee simple title to Travis Park; that by virtue of the use of said park for more than 100 years it has been dedicated by public use to the public as a city park; that the use of the park "cannot be diverted to an inconsistent use." Further the trial court said, "having permitted Travis Park to become dedicated to the public for use as a public park * * * and since the public is still using said park as a city park, though the City acquired fee simple title thereto in its proprietary capacity, this title is now subject to the rights of the public accruing by reason of the dedication, and cannot be diverted to an inconsistent use." And also, "The defendant's [Zachry] plea of estoppel is overruled." The trial judge then entered a judgment declaring the ordinance and contract null and void and of no force and effect whatsoever.

■ It is the general rule that where land has once been dedicated to public use, such as for park purposes, no use inconsistent with its use as a park can be made of the property so long as the public is still using the land as a park. San Antonio v. Lewis, 15 Texas 388, 393; State v. Travis County, 85 Texas 435; 21 S.W. 1029; El Paso Union Passenger Depot Co. v. Look, 201 S.W. 714 (1), affirmed, Texas Com. App., 228 S.W. 917(1); City of Tyler v. Smith County, 151 Texas 80, 246 S.W. 2d 601, 606; City of Dallas v. Gibbs, Texas Civ. App., 1901, 65 S.W. 81, 83, wr. den.; City of Waco v. O'Neal, Texas Civ. App., 1930, 33 S.W. 2d 205(1), wr. ref.; 14-B Texas Jur. 392, Sec. 44; 26 C.J.S. 536, Sec. 54; 26 C.J.S. 557, Sec. 65; 38 Am. Jur. 166, Sec. 487; 39 Am. Jur. 810, Sec. 13; McQuillin, Municipal Corporations, Vol. 10, pp. 109, et seq.; Id., pp. 130-131; Annotations, 18 A.L.R. 1246; Annotations 144 A.L.R. 487. We are aware of the holding of the cases that a dedication made by a municipality is construed less strictly than a dedication made by an individual. Also there are cases which hold that if the municipality owns the fee title to a tract of land and has dedicated it to the use of the public, the municipality may change the use of the land so lang as the new use is for the public benefit.

In the case of San Antonio v. Lewis, 15 Texas 388, cited above, the Court discusses the rule of the French and Spanish law as it affected an alienation of a part of Main Plaza in the City of San Antonio. It was there held that the right of the public to use Main Plaza as a park or recreation place could not be taken away by an attempted conveyance by the authority having control of the property.

In State v. Travis County, 85 Texas 435, 21 S.W. 1029, in discussing the rights of the State of Texas and Travis County in a tract of land in the City of Austin, it is stated that since the tract of land was no longer needed for the use to which it had been dedicated for courthouse or jail purposes, the County could abandon the rights it had in such tract. That case specifically recognizes that had the tract of land been dedicated and used as a public square the County could not put the land to use inconsistent with the dedicated use, so long as the public continued to use the land as a public square.

The case of Look v. El Paso Union Passenger Depot Co., supra, was a case where the City of El Paso had dedicated a tract of land as a public park to be maintained by the Depot Company. The park was used by the public as such including the date of the trial. Later the City became involved with Look and others over the title to a street which ran west and southwest of the park. In settlement of this first suit, the City agreed that it would build a concrete sidewalk 14 feet wide along the south boundary of the park so that Look et al could construct their stores adjoining and facing the sidewalk and thus use the sidewalk for their own purposes. The public also had free access to and use of the walk. The opinions of the Court of Civil Appeals and Commission of Appeals each held that such use was inconsistent with the use of the park by the public, and enjoined the City from building the sidewalk. While the charter of the City of El Paso had an express provision against alienation of park property, neither court relied exclusively upon such charter provision. Each court recognized the general rule that the City of El Paso had no power to put the park to a use inconsistent with its dedicated uses.

The case of City of Tyler v. Smith County, 1952, 151 Texas 80, 246 S.W. 2d 601, involved the right of Smith County to sell the public square to private parties and thus cut off the rights of the public to use the park or square. This Court said:

"Under these undisputed facts evidencing dedication and after more than a century of unquestioned general puublic use following and accepting such dedication, it cannot justly be said that Smith County can now convert the square to private use. Of course, the county may abandon the present square as a site for a courthouse and build a new courthouse wherever it chooses; but if it elects to do that, the entire square must remain impressed with the right of the public to use it for general pub-

lic purposes; it cannot be diverted to private uses. Lamar County v. Clements, 49 Texas 347, supra."

Petitioner relies upon the provisions of the San Antonio charter and the fact that San Antonio is a Home Rule city as authority for the City to make the contract with Zachry. Article 1, Section 3, paragraph 1 of the City Charter under the heading "General Powers" provides in part that "* * * the City may purchase, take, hold, acquire and convey, lease, mortgage and dispose of any property whatever within the city limits * * *." "Paragraph 7.—*Street Powers*" provides in part that "the City of San Antonio shall have the power to lay out, establish, open * * * abandon, discontinue, abolish, close * * * park squares, public places * * *."

■ We must construe the charter powers conferred on the City in the light of constitutional and statutory provisions (Art. 11, Sec. 5, Const.; Art. 1165, Vernon's Ann. Texas Civ. St.) as they pertain to the charter provisions relating thereto. No home rule charter or ordinance passed under the Home Rule Statute shall contain any provision inconsistent with the general laws of the State. Such is elementary and fundamental and requires citation of no additional authorities.

Article 1017, V.A.C.S., provides substantially that a sale of a park or square may be made by an ordinance passed by the governing body of any incorporated city or town, however, incorporated. Article 1019, V.A.C.S. provides that no such public park or square shall be sold until the sale has been authorized by a majority vote of the qualified electors voting at an appropriate election. Article 1020, V.A.C.S. makes the provisions summarized above applicable to all cities and towns regardless of population, or manner and method of incorporation. Article 1112, V.A.C.S., provides that no light system owned by the city, park and/or swimming pools shall ever be sold without such sale being authorized by a majority vote of the qualified voters of the city or town.

In the case of South Texas Public Service Co. v. Jahn, Texas Civ. App., 1928, 7 S.W. 2d 942, 944, wr. ref., it was held that the prohibition against sale of a light system applied even though such system was unencumbered. In the case of City of Dayton v. Allred, 1934, 123 Texas 60, 68 S.W. 2d 172, it was held that the above statute was effective to render void an attempt by the City of Dayton to encumber its utility system. By

its wording the statute includes parks and the reasoning of the above cases will apply to prevent a sale or incumbrance of Travis Park b ythe City of San Antonio until authorized to do so by a majority of the qualified electors of such city.

"In other words, its [City's] title to and power of disposition of property acquired for strictly corporate uses and purposes are different from its title to and power of disposition of property acquired for and actually dedicated to the public use of its inhabitants. As to the former class, the power of the corporation to dispose of it, unless restrained by charter or statute, is unquestioned. * * * *The rule is different as to property held for public use.* * * * The principle is that all such property is held by the municipality in trust for the use and benefit of its citizens and is dedicated to the use of the public, and the corporation cannot divest itself of title without special authority from the legislature. It is only when the public use has been abandoned, or the property has become unsuitable or inadequate for the purpose to which it was dedicated, that a power of disposition is recognized in the corporation. Thus, a municipal corporation has no power to sell or convey land dedicated as a park, square or common. * * *" (Emphasis added). 38 Am. Jur. 165-166, Sec. 487.

Under the facts of this case, as stipulated by the parties, there can be no question that Travis Park has been dedicated and used as a public plaza or park for more than 100 years. City of Tyler v. Smith County, supra; 26 C.J.S. 483, Sec. 40 (6) ; Idem., 493, Sec. 44a.

■ Petitioner claims that the City lawfully abandoned the park. The evidence does not show an actual abandonment, but, on the contrary, shows the public was continuing to use Travis Park for public purposes up to the time of the trial. The findings of the City Council preliminary to the adoption of the ordinance leasing the property to Zachry recites only that the City is abandoning the subsurface of Travis Park as a public park. However, the evidence shows that the proposed plan of construction of the underground parking garage will appropriate approximately one-fourth of the present area of the surface of Travis Park for the use of the private persons operating the storage garage, and their customers and employees. To constitute an abandonment the use for which the property is dedicated must become impossible of execution or the object of the use wholly fail. Adams v. Rowles, 149 Texas 52, 228 S.W. 2d 849, 852, 1950; Magee Heirs v. Slack, 152 Texas 427, 258 S.W. 2d

797, 802 (1); Dallas County v. Miller, 140 Texas 242, 166 S.W. 2d 922; 26 C.J.S. 552, Sec. 63.

We have in our case not only the use of the subsurface, but also the use of about 27,000 square feet of the present surface area of 111,555 square feet for garage off-street parking purposes. The testimony of the architect who drew the proposed plan of operation for the garage shows that the present public sidewalks bordering the park will be destroyed. In their place will be entrance and exit ramps for use of those patronizing the storage garage, tire shops, repair shops, etc. used in connection with the parking garage. Those entrance and exit ramps will be approximately 18 to 25 feet wide. Some 12 to 17 feet of this width will come off the present surface of Travis Park. There will be two of these ramps, one on the west side and one on the east side of the park. In addition, there will be a loading platform on the south side of the park occupying approximately the west one-half of the south 11.5 feet of the park. There is a driveway at and around each of the four corners of the park that uses present surface space of the park. In the center of the park, now occupied by a statute, there would be the escalators whereby patrons of the storage garage leave and enter the garage. This area instead of being approximately the same level as the rest of the park surface will be some three feet higher than the boundary edges of the park. In this area will be a surface structure some 32 feet square to house the escalators and ramps. On the east and west edge of the park there would be two exhaust housings whereby the stale air from the garage would be dispensed in the surface air of the park. These exhausts are each four feet by 16 feet, and project above the surface of the park some two feet.

■ The evidence shows that all of the present surface of Travis Park will be excavated and removed, and that the public will be unable to use the park from the time work starts on the proposed construction until construction is completed and the park refilled and the surface unused by the parking garage has been planted and made into a tract fitted for park purposes; that trees can only be grown in boxes. In the ordinance the subsurface is set out by full legal description, following which there is the statement that "there is likewise granted, leased and let unto the lessee *so much* of the *surface* thereof *as is required for* the proper ingress and egress and for the vent sites to the subsurface. * * *" (Emphasis added). Considering all the stipulations, testimony, exhibits, etc., before the trial court, we agree that an unlawful diversion of Travis Park would take place in

the construction of the garage parking facilities, and that the City Council was without authority to make and enter into the lease. In addition to our holding that there would be an unlawful diversion of Travis Park, we hold the evidence shows no actual abandonment of Travis Park for public purposes. Thus we hold the lease null and void and of no force and effect, and the City is not bound thereby.

The petitioner claims that Travis Park is owned by the City in its proprietary capacity and therefore the City can abandon same or divert the use of same by an ordinance. In view of our holding that Travis Park may not be put to a use inconsistent with its use as a dedicated public park, it becomes immaterial whether Travis Park is held by the City of San Antonio in its proprietary or governmental capacity and we do not decide this question.

Zachry contends that the City is estopped to question the validity of the Zachry lease because of the following: By virtue of its position taken in the lawsuit brought by Mrs. Green et al to set aside this same lease contract; by its acceptance of the services of an attorney employed by Zachry to assist it in defending the Green suit; by the City's continued acceptance of the rent paid by Zachry to City in accordance with the terms of the lease; and by standing by and permitting Zachry to expend the sum of approximately $80,000 necessarily required to carry out his obligations under the lease.

In the case of Radford v. City of Cross Plains, 126 Texas 153, 86 S.W. 2d 204, 1935, Radford had purchased certain revenue bonds issued by the City of Cross Plains without a prior election having been held to authorize their existence. Radford sought to bind the City of Cross Plains upon the doctrine of estoppel to deny the validity of the "revenue bonds." This Court said:

"These bonds having been issued without a vote of the people, in direct contravention of the statute, were void. As the city not only had no authority to issue same without a vote of the people, and as they were issued in violation of law, the city was not estopped to question their validity. Citizens' Bank v. City of Terrell, 78 Texas 450, 14 S.W. 1003."

Section 128 of the city charter provides that the City shall never be estopped to deny an improper deviation of the City's

property. See also 30A Texas Jur. 462, Sec. 442, and authorities there cited. We hold the City is not estopped.

This disposes of all the assignments of error raised by Zachry in his application for writ of error.

The judgment of both courts below are affirmed.

Opinion delivered June 5. 1957.

Associate Justice Norvell not sitting.

MR. JUSTICE GARWOOD concurring.

I agree with the disposition we make of this case on the ground, and only the ground, that, under the evidence, the planned subsurface parking arrangement will destroy the present usage of the surface of the existing park to the large extent stated and will, to a very substantial degree, adversely change the character of the entire surface area as a park.

If the underground parking facilities were to be constructed without such considerable interference with the existing surface use, I think the arrangement would be entirely proper, since the rule, on which we rely to hold it improper, can have no application to the subsurface. The rule was obviously adopted with only surface parks in mind. To extend it to the subsurface, and thus to prevent urgently needed improvements, would be to sacrifice substance to mere legalism.

Opinion delivered June 5, 1957.

MR. JUSTICE SMITH, joined by JUSTICE GARWOOD, dissenting.

The dissenting opinion filed June 5, 1957 has been withdrawn and the following substituted therefor:

Respondent instituted this suit to obtain a declaratory judgment to the effect that a lease contract between it and the petitioner, H. B. Zachry, Trustee, dated October 15, 1953, and made pursuant to an ordinance of the city, was void. The respondent, although with full authority under its home-rule charter to sell, lease, or otherwise dispose of all or any of its property owned in fee simple, is now attempting to repudiate its valid

562

contract with petitioner. The majority has sustained the city
the contract) having once been dedicated to public use as a
public park, cannot be subjected to a use inconsistent therewith.
The majority reasons that, even though under the contract peti-
tioner was to use primarily only the subsurface by the construc-
tion of an underground parking garage beneath Travis Park,
the facts are that the use of the subsurface will require private
use of a portion of the surface, and that the rights granted under
the contract would materially interfere with the use of the park
by the general public. The majority relies upon such cases as
City of Tyler et al. v. Smith County et al., 151 Texas 80, 246
S.W. 2d 601, to support its holding. These cases are not in
point. For example, the City of Tyler case was a so called "pub-
lic square" case involving land first received as a gift from an
individual, and later dedicated by the city. Individuals still later
purchased abutting property in reliance upon the dedicated pur-
pose. The cases cited by the majority and relied upon by the
respondent do not involve the factual situation we have in the
present case. They either involve (1) property acquired by gift
on the sole ground that Travis Park (the property involved in
from a donor with specific provisions as to the use to be made
of same, some with and others without a reversionary clause in
the event of inconsistent use; (2) a plat dedication by the owner
and subsequent purchasers of abutting property in reliance upon
the recorded plat; (3) property acquired by a city by condemna-
tion proceedings and thereafter a dedication of the property
thus acquired by the city for a public use with subsequent at-
tempt to use the same in a manner inconsistent with the dedi-
cated purpose, and (4) suit by taxpayers to enjoin disbursement
of bond money. The case of the City of of Dayton v. Allred,
1934, 123 Texas 60, 68 S.W. 2d 172, cited by the majority, falls
within the last category and has no application here.

In the case at bar the property involved was not acquired by
the city under any of the circumstances listed above. No abut-
ting property owners are involved, and consequently their rights
are not involved. The city did not acquire Travis Park by or
through any legislative enactment by the Legislature of the State
of Texas. The city is not restrained either by statute or the
Constitution from leasing or selling its property known as Travis
Park. On the other hand, the city is expressly authorized by its
charter and by law to lease by ordinance as it has the property,
or any part thereof, for such purposes, term, and consideration
as deemed by it to be necessary and proper. The City of San
Antonio is a home-rule city, and its City Council having deter-
mined the propriety and necessity of leasing the land, and hav-

ing leased it pursuant to such considered determination, the use to which the property has been put or will be put and the extent of such use as between the contracting parties, petitioner and respondent, becomes wholly immaterial. The city had the authority under its charter to abandon and it did abandon so much of the subsurface of Travis Park as was required for the purposes of the lease. Pursuant to the authority granted by its charter, the city by and through its Council, caused the City Clerk to advertise for proposals to construct one or more underground parking stations in designated areas, including Travis Park. Petitioner's proposal in response to such advertisement was accepted by the city, and the ordinance and lease involving Travis Park was thereafter duly executed by the parties on October 15, 1953.

The City Council made certain findings of fact as indicated in the majority opinion. The city, acting through its Council, apparently was firmly of the opinion that it had the authority to maintain and operate what is commonly referred to in this record as off-street parking facilities. The Court of Civil Appeals so held. The city at the time of the adoption of the ordinance and the execution of the lease on October 15, 1953, obviously believed that it also had authority to contract and lease Travis Park for off-street parking purposes. On this point, the Court of Civil Appeals did not agree, holding that although the city had the power to provide parking facilities, it did not have the power to cede that power to others. The court advanced the theory that the furnishing or providing a garage for off-street parking facilities was a governmental function of the city which could not be delegated to others. Therefore, for that reason and that reason alone, the Court of Civil Appeals struck down the lease contract between the city and petitioner.

The majority has decided this case upon an entirely different ground. The majority renders inoperative and nullifies the city charter provisions which authorize such lease. Two methods are used to reach such holding. First, it makes its own findings of fact and substitutes such findings for those of the City Council. Second, it holds that Articles 1019 and 1020, Vernon's Annotated Civil Statutes, are applicable to home rule cities, and, therefore, since the contract was not authorized by a vote of the people, it is void and the lease agreement was unlawfully entered into. I disagree. This Court is not a fact finding body. The

holding that Articles 1019[1] and 1020[2] are controlling is contrary to the decided cases in this jurisdiction dealing with home rule cities. Since the adoption of Section 5[3] of Article 11 of our State Constitution, the Legislature has not been authorized to charter a city of more than 5,000 inhabitants. Section 5 of Article 11, supra, was self enacting. It needed no enabling act to render it effective. By the adoption of the amendment the people substituted the rule of the local inhabitants of the cities for the rule by the Legislature of the state. The City of San Antonio being a home rule city, it follows that its powers are derived from the Constitution, and there is no necessity for an express grant of power from the Legislature. The Legislature does have the right to place limitations upon that power by general law. However, such general laws shall not be applicable to home rule cities unless it has been expressly so stated in the statute. I find nothing in the statutes under consideration which would warrant a conclusion that the city was without power to act in accordance with its charter (voted by its people). Paragraph 1 of Section 3 of Article 1 of that charter expressly provides that:

"* * * the City may purchase, take, hold, acquire and convey, *lease*, mortgage and dispose of any property whatever within the city limits." Emphasis added.

Paragraph 7 provides that:

[1]"No public square or park shall be sold, and no street or alley, nor part or parts of any street or alley closed, until the question of such sale or closing has been submitted to a vote of the qualified voters of the city or town, and approved by a majority of the votes cast at such elecion. Id."

[2]"The provisions of the three preceding articles shall be enforced in towns or cities under five thousand population, or cities over five thousand population which have no special charter, and in towns or cities incorporated under this title, and in cities or towns incorporated under any special law. The power authorized by this article may be conferred upon the governing body by vote of the qualified voters as provided in the preceding article. Id."

[3]"Cities having more than five thousand (5000) inhabitants may, by a majority vote of the qualified voters of said city, at an election held for that purpose, adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature, and providing that no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State; said cities may levy, assess and collect such taxes as may be authorized by law or by their charters; but no tax for any purpose shall ever be lawful for any one year, which shall exceed two and one-half per cent. of the taxable property of such city, and no debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent. thereon; amended or repealed oftener than every two years. As amended Aug. 3, 1909, proclamation Sept. 24, 1909; Nov. 5, 1912, proclamation Dec. 30, 1912."

"* * * the City of San Antonio shall have the power to lay out, establish, open * * * abandon, discontinue, *abolish, close, * * * parks,* squares, public places * * *." Emphasis added.

A review of the history of the organization of the City of San Antonio as well as the history of Articles 1017, 1018, 1019 and 1020 is perhaps necessary to demonstrate that the codifiers in 1925 in rewriting Article 854c and giving it the number 1020 did not change the status of the city of San Antonio as a home rule city. Apparently the majority admits that had the Act of 1925 (Art. 1020) not contained the phrase "towns or cities incorporated under this title," it would have reached a different conclusion relative to the contract involved. This has reference to the present "title 28." The question arises: Did the Legislative Act of 1925 in enacting Article 1020, supra., render such statute applicable to home rule cities without having been adopted by the city by popular vote? I think not. The City of San Antonio was not organized under either Title 17, 18, 22 or 28. It was established as a municipal government many years prior to 1733 under the jurisdiction of the Crown of Spain. See Dittmar v. Dignowity, 78 Texas 22, 14 S.W. 268. Very few changes occurred so far as municipal governments were concerned during the time Texas was a part of Mexico. When Texas became a Republic many cities were incorporated by Congressional Act. In 1856, a general law for incorporation of cities and towns was passed. See Gammel's Laws, Vol. IV, pages 941-946. Charters for cities were also granted by special laws enacted by the Legislature. The Constitution of 1876 provided for special and general law cities and towns. These two classifications of cities continued until 1912 when a third classification (home rule cities) was added by the adoption of Section 5, Article 11, supra. There are no records of any charter filed by the City of San Antonio in the Secretary of State's office other than the one filed in 1951. However, it is stipulated in this record that the City of San Antonio became a home rule city under the Constitutional Amendment of 1912. The Constitution gave the power to the cities to adopt or amend their charters by a majority vote of the qualified electors, and the Legislature is without power to change charters of home rule cities. Vincent v. State ex rel. Wayland, Texas Com. App., 235 S.W. 1084. All amendments to the charter of the City of San Antonio beginning with those of July 6, 1914, have been adopted by a vote of the people in accordance with the Constitution. It seems to me to be unrealistic to hold that although Paragraphs 1 and 7 of Sec. 3 of Article

1, supra, of respondent's charter had been enacted by the vote of the qualified electors, and have never been changed by a vote of the people, and although the Legislature has never by express act changed the method of amending charters of home rule cities, still a contract to lease a park for the purpose of providing off-street parking facilities cannot be valid unless authorized by another vote of the people, as provided in Art. 1020, supra. The City of San Antonio has full power of local self government under the Constitution and in keeping with the Home Rule Amendment of 1912 to the Constitution, all cities operating thereunder are expressly granted the authority to adopt charters by the vote of the people granting the power among others to lease their property, and to abandon, discontinue, abolish or close parks such as Travis Park. The powers of the City of San Antonio, operating under its home rule charter, are limited only so far as such powers are denied by the Constitution and the general laws of the state. I know of no limitation in the Constitution or general laws of the state on the power of the respondent city to sell, lease and convey its property. Furthermore, I do not believe the present city attorney now representing the city agrees with the majority that Articles 1019 and 1020 apply to a home rule city. It is my impression from reading the respondent's briefs filed in the Court of Civil Appeals and from a study of the proceedings in the trial court that the respondent is far from contending that these articles are applicable. The respondent took the position in the Court of Civil Appeals that the city did not possess the power under its charter to maintain and operate an off-street parking garage. The Court of Civil Appeals disagreed with such contention and held that the city was a home rule city and was possessed of such power. The Court of Civil Appeals further held, and I agree with such holding, that the city had the authority under its charter to abandon so much of the surface of Travis Park as necessary for the use of the sub-surface. Art. 1, Par. 3, Par. 7, city charter, supra; Moore v. City of Beaumont, Texas Civ. App., 195 S.W. 2d 968, affirmed, City of Beaumont v. Moore, 146 Texas 46, 202 S.W. 2d 448.

The respondent contended in the Court of Civil Appeals that the contract was invalid because its effect was to divert Travis Park from its dedicated purposes to a use wholly inconsistent with such dedicated purpose. The Court of Civil Appeals, in my opinion, correctly refused to follow this contention by holding that the city "having first abandoned those parts of the park needed for the off-street parking entrances, there would be no inconsistent use." [296 S.W. 2d 301.] The

Court of Civil Appeals denied every contention of the city but
one, and that was that the city did not have the power to cede
its power to provide off-street parking facilities to some one
else. No contention was made that Article 1020, supra, had
any application. It is my contention that since the city has the
power under its charter to lease its property, it becomes im-
material as to the use the property is to be put. Furthermore,
the city not only has the power under its charter to lease Travis
Park as it did, but it also has such power under Article 1017.[4]
See Forward v. City of Taylor, 147 Texas 161, 214 S.W. 2d
282; Yellow Cab Transit Co. v. Tuck, Texas Civ. App., 115
S.W. 2d 455, wr. ref.; Moore v. City of Beaumont, supra.,
Wilder v. American Produce Co., 138 Texas 519, 160 S.W.
2d 519.

Let us next review the history of Arts. 1017, 1018, 1019
and 1020. The basis of these articles stems from Art. 375,
Revised Civil Statutes of Texas 1879 as a part of Title 17.
In 1889, Art. 375 was amended and carried forward into the
revision of 1889 as Art. 419 and the title was changed to Title
18. Again the title was changed in the revision of 1911 to
Title 22 and Art. 375(419) became Art. 854 with substantially
the same language as the two forerunners. It is to be noted
that up to 1911 there was nothing in Art. 854 that is similar
to the language in the present day articles 1017, 1018, 1019
and 1020. The actual basis of these present day articles lies in
the amendment to Art. 845, Title 22 made in 1913. 33rd Leg.,
1913, p. 326; General Laws, ch. 152. The same Legislature
that enacted the amendment to Art. 845 also passed the home
rule statute, both of which became effective at the same time.
Article 854c provides that the act shall be enforced in cities
and towns "incorporated under Title 22." The home rule sta-
tute was not a part of Title 22 at the time and never has been
a part of Title 22. Thus, it is my contention that Article 854
in 1913 was a part of Title 22 and that it did not apply to
home rule cities as the home rule statute was not a part of

---

[4]"The governing body of any incorporated city or town in this State, how-
ever incorporated, may sell and convey any land or interest in land owned, held
or claimed as public square, park or site for city hall or other municipal build-
ing, and abandoned parts of streets and alleys, together with all improvements
in any such property owned by any such city or town. The proceeds of any such
sale shall be used only for the acquisition and improvement of property for the
same uses as that so sold. Provided, however, that the title of any purchaser of
such property for a valuable consideration shall not be impaired by reason of
the failure of such governing body to so apply said funds. Such sale shall be
made by an ordinance passed by such governing bodies which shall direct the
execution of conveyance by the mayor or city manager of any city or town.
Acts 1913, p. 326; Acts 1947, 50th Leg., p. 151, ch. 88, Sec. 1."

Title 22. San Antonio was not incorporated under Title 22. Neither was it incorporated under Title 28."

The City of San Antonio has the power to sell or lease any of its lands acquired in its municipal or corporate capacity. Travis Park was so owned. The City Council made the following findings of fact relating to the necessity and propriety of executing the lease and these findings are conclusive. The fact findings by this Court cannot supercede such findings.

The Council found that:

"1) a deplorable traffic congestion now exists in the central or downtown section of the City of San Antonio and in the vicinity of Travis Park.

"2) such condition constitutes a hazard to the lives of the citizens in general and that the lack of parking facilities in the downtown area severely affects the economy of the City.

"3) the construction of an underground parking facility would be a valid public purpose and of immeasurable value to the City, its citizens and the public in general, and would form an adjunct to the City's Civilian Defense plan.

"4) the subsurface of Travis Park is useless and unusable as a public park, and there is no reasonable prospect of any such use at any foreseeable time in the future; and is of no value to the City in its present state, nor will it be of any value unless converted to use as an underground or off-street parking facility.

"5) the construction, operation and maintenance of an automobile parking station by the use of the subsurface of Travis Park will not materially interfere with or be inconsistent with the use of the surface area by the public as a park, under the terms of the lease, will be restored in accordance with the plans and specifications therefor on file in the office of the City Manager."

The finding that the use of the subsurface of Travis Park would not materially interfere with or be inconsistent with the use of the surface area by the public as a park is supported by the evidence. Mr. Ayres, an architect, and the only expert who testified to facts bearing on this question, said: "I will say frankly there would be considerably more usable park area

on this plan than there is in the existing park, in that we not only have these walk areas in here, and areas on the south of the housing area for people to sit and we also have these long wide areas on the east and west sides of the park, which are shaded. I would say there will be more usable area." It was said in the case of Forward et al v. City of Taylor, supra: "It was the purpose of the Home-Rule Amendment, Art. XI, Sec. 5, and the enabling statutes, supra, to bestow upon accepting cities and towns of more than 5,000 population full power of self-government, that is, full authority to do anything the legislature could theretofore have authorized them to do. The result is that now it is necessary to look to the acts of the legislature *not for grants of power to such cities* but only for limitations on *their powers.*" Emphasis added.

The opinion goes further than that by pointing out that Article 1175, Revised Statutes, 1925, states that home rule cities shall have full power of local self government, and enumerates 34 sections prescribing powers. The opinion then quotes Article 1176, which provides: "The enumeration of powers herein above made (Art. 1175) shall never be construed to preclude, by implication or otherwise, any such city from exercising the powers incident to the enjoyment of local self government, provided that such powers shall not be inhibited by the State Constitution." If the respondent accepts victory in this case on the theory advanced by the majority it will be doing so at the sacrifice of all of its rights and powers granted to it under the Constitution. I can't believe that it was the intention of the Legislature by the enactment of Article 1020, supra, to change or limit the plenary powers that a home rule city now enjoys.

In the case of Yellow Cab Transit Co. v. Tuck, [Texas Civ. App., 115 S.W. 2d 457] the court said: "The Legislature has uniformly recognized, guarded, and preserved the plenary powers of municipal corporations operating under the Home Rule Amendment and the Enabling Act of the Legislature, over the streets, alleys and public places located within the corporate limits." See also City of Sherman v. Municipal Gas Co., 133 Texas 324, 127 S.W. 2d 193.

I make the further contention that the city has the power to change the character of use of Travis Park so long as the new use is for the puublic benefit. The majority recognizes this principle, but declines to give it effect. The majority says

in its opinion "there are cases which hold that if the municipality owns the fee title to a tract of land and has dedicated it to the use of the public, the municipality may change the use of the land *so long as the new use is for the public benefit.*" Emphasis added. With reference to this, the petitioner reasons, and I agree with him when he says:*

" With this Court recognizing and stating such principle, it evidently must have concluded that the 'new use' of the subsurface and of 14.2% of the surface of Travis Park contemplated by the contract between Petitioner and Respondent would not be a use 'for the public benefit.'

"In the face of the evidence in this case, such a conclusion is indeed difficult to justify. The 'new use' of a fraction of the park—and, it is reiterated, a use which under the uncontradicted evidence would make the park more usable for the public — would alleviate traffic congestion, and most certainly that is 'for the public benefit.' The 'new use' would give the citizens of San Antonio a parking area near the main shopping district of the town, and that too would appear to be 'for the public benefit.' Finally, the 'new use' eventually would give the Respondent City of San Antonio parking facilities worth at least three and one-half million dollars without any cost to itself, and that would scarcely appear to be detrimental to the public. Times and circumstances change, and so do and should legal concepts and circumstances. Underground parking facilities, such as those contemplated in the proposed lease contract, were not known two decades ago, and it is entirely possible that, in deciding cases in that era, the courts may have employed language which would not embrace such facilities. However, as said in *City of Tombstone v. Macia*, 30 Ariz. 218, 245 Pac. 677, [46 A.L.R. 828], in a quotation adopted by the Court in Gillham v. City of Dallas, 207 S.W. (2d) 978, 982, (refused, n.r.e.) :

" 'In considering what is properly a public purpose, we should not be controlled to too great an extent by decisions of courts in climates far distant from ours. *Further, we should not be too great an extent controlled by decisions which come from a remote time, and therefore may be out of tune with modern conditions. The question of what is a public purpose is a changing question, changing to suit industrial inventions and developments and to meet new social conditions.' "*

---

*Petitioner's motion for rehearing in Supreme Court, page 27. Editor.

"Clearly, the use of the subsurface and a portion of the surface of Travis Park for an underground garage is to use such park to aid in solving a problem created by new social conditions. Such a use should be permitted, especially so since there is no impairment of the use of the park for its intended purpose. * * *"

The city executed the lease in its proprietary capacity, therefore the same rules of law govern the city as those that govern individuals when it contracts as to its proprietary interests. See City of San Antonio v. San Antonio Irrigation Co., 118 Texas 154, 12 S.W. 2d 546; City of Crosbyton v. Texas-New Mexico Utilities Co., Texas Civ. App., 157 S.W. 2d 418, er. ref. w.o.m.; City of Houston v. Shillings, 150 Texas 387, 240 S.W. 2d 1010. Therefore, I cannot agree with the holding of the Court of Civil Appeals that the lease was void for the reason that the providing of off-street parking facilities is a governmental function of the city which could not be delegated to others. I mention this holding because I conceive it to be the duty of this Court to affirm the judgment of the Court of Civil Appeals if it can be affirmed on any ground presented in that court. Apparently the majority does not uphold the ground upon which the Court of Civil Appeals decided the case. To say the least the point is not discussed. Therefore, I shall only call attention to the fact that the Court of Civil Appeals failed to recognize that municipal corporations are created for the exercise of certain governmental and proprietary functions of government. Yett v. Cook, 115 Texas 205, 281 S.W. 837. Failure to recognize that municipal corporations have a twofold character, one governmental and the other private or proprietary, leads oftimes to and accounts for the failure to give effect to the difference between a city's governmental powers and its proprietary or corporate powers. The City of San Antonio owns the fee simple title to Travis Park in its municipal or corporate capacity rather than in any governmental capacity, and this being true, the city had full power to lease such property in the manner authorized by its home rule charter. In the case of City of Port Arthur v. Young, Texas Civ. App., 37 S.W. 2d 385, 389, wr. ref., wherein a lease was involved, the court held: "As the City held this property, by the terms of the grant, not in the exercise of its governmental powers, but in its capacity as a municipal corporation, it was not prohibited by the general laws nor by its charter nor by the statutes and constitution of the state from leasing the property." The court further said: "There is no merit in the contention that the lease was void because not authorized

by an election held for that purpose." See also Lewis v. City of San Antonio, 7 Texas 288; Wright v. Town of Victoria, 4 Texas 376.

At the risk of being repetitious I want to say again that the doctrine of unlawful diversion and inconsistent use have no application to the facts in this case. The cases such as City of Dallas v. Gibbs, 27 Texas Civ. App. 275, 65 S.W. 81, wr. denied; El Paso Union Passenger Depot Co. v. Look, 201 S.W. 601, affirmed, Texas Com. App., 228 S.W. 917; State v. Travis County, 85 Texas 435, 21 S.W. 1029, on which the majority relies, involved different factual situations than the case at bar. None of these cases involve property held in fee simple by a city in its proprietary capacity. They fall under one or the other of the categories mentioned earlier in this opinion.

The judgment of the Court of Civil Appeals should be modified to hold that in addition to possessing the power to maintain and provide for off-street parking facilities, the city further possesses the power to exercise the proprietary power to lease Travis Park as it did, and, therefore, the lease is in all things valid. In any event, it should be held that the city has the power to lease the subsurface of the park, and that since it does have such power, it has the power and authority by ordinance to abandon so much of the surface of the park as needed to render effective the lease contract, and enable the petitioner to adequately provide the subsurface off-street parking facilities. Such an ordinance when supported by findings of fact by the City Council is authorized by the charter under which the City of San Antonio operates, and a favorable vote of the people is not required as a step precedent to the adoption of such ordinance.

Opinion delivered and filed October 9, 1957.

Rehearing overruled October 9, 1957.