Court Of Appeals
Fourth Court of Appeals District of Texas


★ ★ ★  ★ ★ ★

## OPINION

No. 04-07-00325-CV

**GALLAGHER HEADQUARTERS RANCH DEVELOPMENT, LTD.**,
Christopher Hill, and Julie Hooper,
Appellants

v.

**CITY OF SAN ANTONIO**,
City Public Service, and San Antonio Water System,
Appellees

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-01377
Honorable David A. Berchelmann, Jr., Judge Presiding

Opinion by:     Phylis J. Speedlin, Justice

Sitting:        Alma L. López, Chief Justice
               Phylis J. Speedlin, Justice
               Rebecca Simmons, Justice

Delivered and Filed:   July 23, 2008

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

      Gallagher Headquarters Ranch Development, Ltd., Christopher Hill and Julie Hooper

(collectively referred to as "Hill") appeal the trial court's summary judgment in favor of the

defendants, the City of San Antonio, City Public Service, and San Antonio Water System

(collectively, the "City"). The underlying lawsuit concerns the City's placement of an electrical

transmission line across open space park land. The land was acquired by the City as an approved

venue project and funded through a venue tax. Hill brought several injunctive and declaratory judgment claims against the City, but his appeal is based only on his claim that the City breached its "contract with the voters." Because we are constrained by the plain language of section 334.041(b) of the Local Government Code, which grants the City broad authority to convey or otherwise dispose of an interest in an approved venue project, we affirm the trial court's judgment.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

On May 6, 2000, City of San Antonio voters approved Proposition 3 which authorized an additional 1/8 of 1% sales and use tax, or "venue tax," to fund the City's acquisition of land for use as linear parks along Salado and Leon Creeks and as open space parks over the Edwards Aquifer Recharge Zone; the project was designated an "approved venue project" under Chapter 334 of the Texas Local Government Code. In February 2002, using funds from the Proposition 3 venue tax, the City purchased a portion of the Mayberry Ranch on the west side of Highway 211. In October 2003, using Proposition 3 venue tax funds, the City purchased the Chris Hill Tract – an unimproved 710 acre tract on the west side of Highway 211 which lies entirely in the Edwards Aquifer Recharge Zone.

In early 2004, the City granted the San Antonio Water System (SAWS) a conservation easement in perpetuity on the Chris Hill Tract, restricting the development and use of the property to low impact human activities like hiking and camping, and related maintenance and infrastructure, and prohibiting any residential, commercial or industrial use. Also in early 2004, after considering other alternatives to address increased demand for electricity in the hill country, City Public Service (CPS) and the Lower Colorado River Authority (LCRA) proposed constructing a 345,000 volt

---

[1] Hill does not challenge the constitutionality of the statute on appeal.

electrical transmission line from the LCRA's Cagnon substation to CPS's Kendall substation (the "Project"). As proposed, the transmission line would run along the edge of the Mayberry and Chris Hill Tracts following an existing right-of-way adjacent to Highway 211, and would require placement of up to five 17-story transmission towers. In January 2005, despite the City Planning Commission's rejection of the placement of the Project across Proposition 3 land, the City Council approved Ordinance 100326, granting CPS a limited easement over the two Proposition 3 tracts for purposes of constructing, maintaining and operating the Project. In a separate intra-jurisdictional agreement, CPS agreed to convey to the City 40 acres of additional open space land as compensating property.

Approximately one week after the City Council approved the Project, Hill filed suit in state district court seeking injunctive and declaratory relief; Hill also challenged the Project in federal court and before the Public Utility Commission. Hill pled several declaratory judgment claims in the state case, including that Ordinance 100326 granting CPS an easement for the Project was void as a breach of the "contract with the voters" created by Proposition 3 and its enabling resolution and ordinances. The parties filed multiple partial summary judgment motions on the various claims raised by Hill. The trial court granted summary judgment in favor of the City on Hill's claims under Article XI, § 11 of the Texas Constitution, the Texas Open Meetings Act and the City Charter. None of those orders are challenged on appeal. The parties also filed cross-motions for summary judgment on Hill's common law claim for breach of the City's "contract with the voters," as well as his statutory claims under Chapter 334 of the Local Government Code and Chapter 26 of the Texas Parks and Wildlife Code. The trial court overruled all of the parties' objections to the summary judgment evidence, denied Hill's summary judgment motion, and granted the City's

summary judgment motion as to all of Hill's remaining claims. The trial court further ordered Hill to pay $884,332 in attorney's fees to the City.[2]

## ISSUE PRESENTED

On appeal, Hill challenges only the summary judgment in favor of the City on his common law breach of the "contract with the voters" claim, and asserts the trial court instead should have granted summary judgment for Hill on that claim. Hill also challenges the award of attorney's fees because they were not segregated by claim. The City's position in the trial court, and on appeal, is that it properly conveyed to CPS a limited easement to use a small portion of the Proposition 3 land for the Project pursuant to the express statutory authority granted to it in section 334.041(b) of the Local Government Code. TEX. LOC. GOV'T CODE ANN. § 334.041(b) (Vernon 2005) (providing in relevant part, "[a] municipality . . . may acquire, sell, lease, convey, or otherwise dispose of property or an interest in property, including an approved venue project, under terms and conditions determined by the municipality . . . "). The basis of the City's Third Motion for Partial Summary Judgment on Hill's "contract with the voters" claim was that the specific and broad grant of authority in section 334.041(b) conflicts with, and thus supersedes, the common law doctrine of "contract with the voters." On the other hand, Hill's summary judgment motion asserted, in relevant part, that the City had not "conveyed" an interest in the property to CPS under section 334.041(b), but rather the Ordinance had simply and plainly changed the dedicated use of the approved venue project and was thus unenforceable as a matter of law. Hill also asserted that Chapter 334 does not

---

[2] During the pendency of this litigation, the electrical transmission line was constructed. The City represents that four utility poles were placed on the Chris Hill Tract, with no poles placed on the Mayberry Tract; each pole has a base of approximately 80 square feet. In addition, high wires span the poles, overlapping the existing right-of-way along State Highway 211. It is undisputed that no Proposition 3 venue tax funds were used for construction of the Project.

abrogate or "trump" the common law doctrine of "contract with the voters," but instead works in harmony with, and is "subject to," the doctrine. While the trial court's order granting summary judgment for the City does not recite the specific grounds on which it is based, the sole ground in the City's summary judgment motion with respect to Hill's "contract with the voters" claim was that the express statutory language in section 334.041(b) directly conflicts with, and thus supersedes, the common law contract with the voters created by Proposition 3, and its enabling resolutions and ordinances.

### SUMMARY JUDGMENT

#### *Standard of Review*

When both parties move for summary judgment, and the trial court grants one motion and denies the other, the appellate court considers the summary judgment evidence presented by both sides, determines all questions presented, and, if it determines the trial court erred, renders the judgment the trial court should have rendered. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We review the trial court's summary judgment *de novo*. *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Id.* A party moving for a traditional summary judgment must show that no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law. *Id.* at 215-16; TEX. R. CIV. P. 166a(c). When the trial court's order does not specify the grounds for granting summary judgment, the appellate court must affirm if any of the theories presented in the summary judgment motion have merit. *Knott*, 128 S.W.3d at 216; *Cincinnati Life*

*Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996). Statutory construction is a question of law that we review *de novo*. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).

### *"Contract with the Voters" Doctrine*

The doctrine of "contract with the voters" derives from article I, section 16 of the Texas Constitution which prohibits laws impairing the obligation of contracts. TEX. CONST. art. I, § 16. The constitutional underpinnings of the doctrine have long been recognized by the Texas Supreme Court. In *San Saba County v. McCraw*, the seminal "contract with the voters" case, the Supreme Court held that "the vital conditions and safeguards surrounding the tax voted at the time of the election thereon become a part of the very election itself," and any law that impairs and destroys the voters' rights existing at the time of the vote violates article 1, section 16 of the Texas Constitution. *San Saba County v. McCraw*, 130 Tex. 54, 108 S.W.2d 200, 202-03 (1937) (also acknowledging that "where the Constitution authorizes the levy of a special tax by a vote of the taxpaying voters of a municipality . . . such tax is not levied by the municipality . . . but by the voters to whom has been delegated the taxing power"). In *McCraw*, a majority of the voters approved a fifteen-cent road tax to be levied by the county, as required by the Constitution; the implementing statute further provided that the voters could repeal the road tax after two years, and that no bonds could be issued. *Id.* at 201. The legislature subsequently enacted a statute authorizing the commissioners' court to issue 40-year bonds on its own motion that would constitute a charge against the fifteen-cent road tax. *Id.* at 202. The Supreme Court concluded that, by authorizing the county commissioners' court to issue the 40-year road-funding bonds without a taxpayer vote, the legislature had impaired the voters' rights created at the time they approved the fifteen-cent road tax, including the right to repeal the tax, thus violating not only the particular constitutional provision authorizing the road tax to be

imposed by the voters, but also article I, section 16 prohibiting the impairment of contracts. *Id.* at 203; *see also San Antonio River Auth. v. Shepperd*, 157 Tex. 73, 299 S.W.2d 920, 924-26 (1957) (recognizing and applying the "contract with the voters" concept).[3]

As noted by both parties in their briefs, the "contract with the voters" doctrine encompasses two related principles governing (i) the expenditure of the tax funds for the approved purpose, and (ii) the continued use of the project for the approved purpose. Applying the first principle, when the voters approve a specific project, the proceeds of the tax or bond are "'earmarked' with the character of a trust fund which may not be diverted to another purpose or project." Op. Tex. Att'y Gen. No. GA-0156, 2004 WL 367365, at *6 (2004) (citing *Black v. Strength*, 112 Tex. 188, 246 S.W. 79 (1922), and *Fletcher v. Ely*, 53 S.W.2d 817, 818 (Tex. Civ. App.—Amarillo 1932, writ ref'd)); *see also Lewis v. City of Fort Worth*, 126 Tex. 458, 89 S.W.2d 975, 978 (1936) ("the proceeds of bonds voted by the people must be expended for the purposes for which they were voted"); *Barrington v. Cokinos*, 161 Tex. 136, 338 S.W.2d 133, 142 (1960) (same). For example, in Op. Tex. Att'y Gen. No. GA-0156, the Attorney General concluded that the terms of the election pursuant to which Terrell County voters approved a venue tax for park improvements under Chapter 334 of the Local Government Code constituted a "contract with the voters," and the county commissioners' court was

---

[3] Although not binding on us, we note that recent opinions by the Texas Attorney General have recognized the constitutional basis of the "contract with the voters" doctrine, as well as its continuing validity. *See* Op. Tex. Att'y Gen. No. GA-0156, 2004 WL 367365, at *5 (2004) (acknowledging that "Texas courts have held that the express terms of resolutions and orders calling a tax or bond election, at which voters are asked to approve financial undertakings of a governmental body relating to the purposes for which funds shall be used, become a contract with the voters who are entitled to receive substantially all of the benefits and security of that contract"); Op. Tex. Att'y Gen. No. GA-0049, 2003 WL 1697188, at *3 (2003) (stating that a tax or bond proposition, and its constitutional and statutory conditions and safeguards, form a "contract with the voters" and any attempt to substantially alter the rights and expectations of the voters will be treated as a violation of article I, section 16 of the Texas Constitution, prohibiting laws impairing the obligations of contracts); Op. Tex. Att'y Gen. No. JC-0400, 2001 WL 871791, at *4 (2001) (stating that under the *San Saba* rule, the terms of an order calling an election at which voters are asked to approve financial undertakings of a governmental body become a "solemn contract with the voters," and "any attempt to substantially alter the rights and expectations of the voters will be treated as a violation of . . . article I, section 16 of the Texas Constitution").

only authorized to use the venue tax funds for the specific improvements outlined in the election orders.  Op. Tex. Att'y Gen. No. GA-0156, 2004 WL 367365, at \*9.

Under the second principle of the "contract with the voters" doctrine, when land is purchased with voter-approved funds it becomes dedicated to that purpose and cannot be used for any other purpose that would interfere with the stated public use.  *City of Beaumont v. Moore*, 146 Tex. 46, 202 S.W.2d 448, 452 (1947) (where city purchased land with proceeds of municipal bonds approved for acquiring an airport, land became dedicated for public use as an airport and could not be used for any other inconsistent purpose until its use as an airport was lawfully abandoned).  Generally, when land has been dedicated to a public use, such as for a park, no inconsistent use may be made as long as the public is still using the land as a park.  *Zachry v. City of San Antonio*, 157 Tex. 551, 305 S.W.2d 558, 560 (1957).  In *Zachry*, the court held that where the land had been dedicated to the city and used as a public park for more than 100 years, without any abandonment, the city's attempted lease of a portion of the park to an individual for use as an underground parking garage was void.  *Id.* at 562-63 (abandonment of dedicated property occurs when the dedicated use becomes impossible to execute, or the object of the use must fail).

Applying both concepts of a "contract with the voters" to this case, the City would be obligated to:  (i) use the venue tax funds for their approved purpose, *i.e.*, acquisition of land for use as open space and linear parks; and (ii) use the land acquired with the venue tax funds for the approved or "dedicated" purpose, *i.e.*, as open space or linear parks.  There is no dispute that the City complied with its first obligation by acquiring the Mayberry and Chris Hill Tracts with the venue tax funds for use as public park land, as contemplated by Proposition 3.  The dispute arises out of whether the City has breached its second obligation under its "contract with the voters" – to

use the land for the approved public park purpose – by granting CPS a limited easement for construction of the electrical transmission line, thereby "changing the use" of the approved venue project. The City concedes that, for purposes of reviewing the summary judgment granted by the trial court, we must take as true Hill's allegation that the Project constitutes an "inconsistent use" of the Proposition 3 land.

### *Section 334.041 of the Texas Local Government Code*

Under Chapter 334 of the Local Government Code, enacted in 1997 and entitled "Sports and Community Venues," a county or municipality may plan, acquire, establish, develop, construct, or renovate a venue project, and may raise funds to accomplish such tasks, if, among other things, the voters approve the project. TEX. LOC. GOV'T CODE ANN. § 334.021 (Vernon 2005). An "approved venue project" means a sports and community venue project that has been approved under Chapter 334 by the voters of a municipality or county.[4] TEX. LOC. GOV'T CODE ANN. § 334.001(1) (Vernon 2005). Chapter 334 requires that a resolution and ballot language proposing a venue project describe the specific venue project, and provides that sales and use taxes deposited in a venue-project fund may be expended only for voter-approved venue projects. *See* TEX. LOC. GOV'T CODE ANN. §§ 334.021 (resolution authorizing project and method of financing), .024 (election), .042 (venue project fund) (Vernon 2005); *see also* Op. Tex. Att'y Gen. No. GA-0156, 2004 WL 367365, at *5.

---

[4]A "sports and community venue project" or "venue project" means a venue and related infrastructure that is planned, acquired, developed, constructed or renovated under Chapter 334. TEX. LOC. GOV'T CODE ANN. § 334.001(5) (Vernon 2005). A "venue" is defined to include a municipal parks and recreation system, or improvements or additions thereto, while "related infrastructure" includes a store, restaurant, on-site hotel, concession, parking or transportation facility, road or street, water or sewer facility, park, "other . . . improvement that relates to and enhances the use, value, or appeal of a venue" and "any other expenditure reasonably necessary to construct, improve, renovate, or expand a venue . . . ." *Id.* § 334.001(3), (4)(D) (Vernon 2005).

The particular statute at issue in this case, section 334.041, entitled "General Powers," grants broad authority to municipalities and counties with regard to venue projects. Subsections (a) and (b), relevant to this appeal, provide as follows:

> (a) A municipality or county may perform ***any act necessary*** to the full exercise of the municipality's or county's powers under this chapter.
>
> (b) A municipality or county may acquire, sell, lease, convey, or otherwise dispose of property or an interest in property, ***including an approved venue project***, under terms and conditions determined by the municipality or county. In a transaction with another public entity that is made as provided by this subsection, the public purpose found by the legislature under Section 334.044 is adequate consideration for the municipality or county and the other public entity.

TEX. LOC. GOV'T CODE ANN. § 334.041(a), (b) (Vernon 2005) (emphasis added); *see* TEX. LOC. GOV'T CODE ANN. § 334.044(a) (Vernon 2005) (stating that, "the legislature finds for all constitutional and statutory purposes that an approved venue project is owned, used, and held for public purposes by the municipality or county").

*Analysis*

Hill's main argument on appeal is that, while section 334.041(b) permits the City to ***convey an interest*** in an approved venue project, it does ***not*** say that the City may ***change the approved use*** of the venue project. Hill argues the omission of express authority to change the use of a venue project from section 334.041(b) gives rise to the "clear implication" that the use of an approved venue project must not change – regardless of the City's conveyance of the project to a private third party or other public entity. In essence, then, Hill argues that section 334.041(b) is "subject to," or incorporates, both principles of the "contract with the voters" doctrine. Therefore, this appeal requires us to address the interplay between section 334.041(b) and the common law "contract with the voters" concept with respect to the approved use of the Proposition 3 land.

The City asserted at oral argument that the dispute can be resolved by answering two questions: (1) did the legislature have the authority to supersede the common law "contract with the voters" doctrine by contrary legislation? and (2) if so, did the legislature do so in section 334.041(b)? The City contends the answer to both questions is "yes," and we are constrained to agree.

### 1.     *Legislative Authority to Supersede Common Law*

In construing statutes, courts begin by interpreting the statutory language in a manner that renders it consistent with constitutional requirements, if possible, because the legislature is presumed to have intended compliance with the constitution. *City of Houston v. Clark*, 197 S.W.3d 314, 320 (Tex. 2006); *see also* TEX. GOV'T CODE ANN. § 311.021(1) (Vernon 2005) ("[i]n enacting a statute, it is presumed that ... compliance with the constitutions of this state and the United States is intended"). The courts further presume that statutes are enacted by the legislature with full knowledge of, and reference to, the existing law. *City of San Antonio v. Hardee*, 70 S.W.3d 207, 213 (Tex. App.—San Antonio 2001, no pet.). When a statute directly conflicts with a common law principle or claim, the statutory provision controls and preempts the common law. *Cash America Int'l Inc. v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000) (abrogating common law claims is "disfavored and requires a clear repugnance between the common-law and statutory causes of action"); *Bartley v. Guillot*, 990 S.W.2d 481, 485 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (where the common law is revised by statute, the statute controls). A statute may be interpreted as abrogating a common law principle only when its express terms or necessary implications clearly indicate the legislature's intent to do so. *Bruce v. Jim Walters Homes, Inc.*, 943 S.W.2d 121, 122-23 (Tex. App.—San Antonio 1997, writ denied). "If a statute deprives a person of a common law right, the

statute must be strictly construed and will not be extended beyond its plain meaning." *Id.* at 123 (citing *Smith v. Sewell*, 858 S.W.2d 350, 354 (Tex. 1993)). Therefore, the answer to the first question concerning whether the legislature may enact legislation that preempts or supersedes a common law principle, even one that is constitutionally-derived, is affirmative.

### 2.    *Interplay between § 334.041(b) and "Contract with Voters"*

Reaching the crux of this appeal, we must next determine whether section 334.041(b) evidences the legislature's intent to supersede the common law concept of "contract with the voters," particularly the second principle requiring continuous use for the dedicated public purpose. In the trial court and on appeal, the City asserts that, under the plain language of section 334.041(b), its "contract with the voters" only extended to the first principle, *i.e.*, the initial expenditure of the venue tax funds to acquire the property for use as park land. The City contends the broad grant of authority in section 334.041(b) supersedes or preempts the second principle of "contract with the voters," and it therefore has no continuing obligation or duty to continue using the acquired land for the dedicated public purpose, *i.e.*, as open or linear park land. To illustrate, the City acknowledged at oral argument that, according to its reading of the statute, it could use a voter-approved venue tax to acquire land for construction of a major league baseball field as a Chapter 334 "approved venue project," and then later, under the authority of section 334.041(b), convey that land, or a portion thereof, to a private third party for use as a toxic waste dump without violating its "contract with the voters."[5]

---

[5] The City conceded that other statutes, such as environmental laws, might prevent that particular use of the land, but that such a change in use would be permitted under section 334.041(b).

When construing a statute, the court's primary purpose is to give effect to the legislature's intent. *Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 21 (Tex. 1996). To determine the legislative intent, a court may consider the language of the statute, the legislative history,[6] the circumstances of the statute's enactment, the object the legislature was seeking to attain, the common law and former statutory provisions on the same or similar subjects, administrative construction of the statute, and the consequences of particular constructions. TEX. GOV'T CODE ANN. § 311.023 (Vernon 2005); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994). The court must, however, look first to the plain and common meaning of the statute's words, and if the statutory text is unambiguous the court must adopt the interpretation supported by the plain language – unless that interpretation would lead to absurd results. *Tex. Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865-66 (Tex. 1999) (if a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity). Finally, the construction of a statute by an agency charged with its execution is entitled to "serious consideration" unless the agency's construction is clearly inconsistent with the legislature's intent. *Brushy Creek*, 917 S.W.2d at 21; TEX. GOV'T CODE ANN. § 311.023(6) ("in construing a statute . . . a court may consider . . . administrative construction of the statute").

---

[6] Hill attached excerpts of the legislative history of a proposed 2003 amendment to Chapter 334 to his summary judgment motion, arguing that legislators' statements during the debate show their intent that use of approved venue projects be restricted to their dedicated public purpose, regardless of a conveyance under section 334.041(b). The proposed amendment did not pass. Hill asserts that the amendment's failure to pass shows Chapter 334 was understood by the drafters to require the continuation of the dedicated public use; therefore, an amendment stating this requirement was not necessary. Hill's argument is based on speculation as to the reason the amendment did not pass. Moreover, legislators' statements during a debate cannot change the plain meaning of the statute, which in this case grants broad unrestricted authority to municipalities to make conveyances of approved venue projects. *See Fleming Foods of Tex., Inc., v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999) (legislative history cannot be used to alter or disregard express statutory terms when their meaning is clear in context of entire code).

Here, we are faced with conflicting interpretations of section 334.041(b), with the City arguing the statute directly conflicts with, and thus supersedes, the continuous-use principle of the common law "contract with the voters" doctrine, and Hill arguing the statute is consistent with, and "subject to," the common law concept. Applying the above principles of statutory construction, we must begin with the presumptions that, when it enacted section 334.041(b), the legislature intended it to comply with the Constitution and it was aware of the constitutionally-derived, common law concept of "contract with the voters." Next, we must construe the legislature's intent behind section 334.041(b) based on the statute's plain language, considering it as a whole and within the context of Chapter 334. If we conclude the statutory text is unambiguous, we must adopt the interpretation supported by the plain language, unless it leads to absurd results. If we determine that the statute directly conflicts with the common law, the statute controls.

Looking at section 334.041 as a whole, and within the context of Chapter 334, section 334.041 delineates the "powers and duties" of a municipality with respect to the "planning, acquisition, establishment, development, construction, or renovation" of sports and community venue projects. TEX. LOC. GOV'T CODE ANN. §§ 334.021(a), 334.041 (Vernon 2005). As noted, subsection (a) of section 334.041 grants a municipality the sweeping power to "perform any act necessary to the full exercise of [its] powers" under Chapter 334. TEX. LOC. GOV'T CODE ANN. § 334.041(a); *see* Op. Tex. Att'y Gen. No. GA-0602, 2008 WL 410391, at *1 (2008) (recognizing broad scope of power under subsection (a)). The remaining subsections (b) through (f) more specifically describe the municipality's power to enter into contracts and take certain actions with respect to acquiring and developing approved venue projects; subsection (f) restricts the

municipality's use of ad valorem taxes for an approved venue project.  TEX. LOC. GOV'T CODE ANN. § 334.041(b)-(f) (Vernon 2005).

Turning to the provision at issue, subsection (b) of section 334.041, the plain language of the first sentence gives a broad unequivocal grant of authority to a municipality to "acquire, sell, lease, convey, or otherwise dispose of property or an interest in property, including an approved venue project, *under terms and conditions determined by the municipality*."  TEX. LOC. GOV'T CODE ANN. § 334.041(b) (emphasis added).  By its plain language, it leaves the "terms and conditions" of such transactions completely to the municipality's discretion, and contains no express limitation or restriction on the municipality's power to "convey or otherwise dispose of" an interest in an approved venue project.  Reading subsection (b) together with subsection (a)'s similarly unrestricted grant of authority to "perform any act necessary" to exercise the municipality's powers under Chapter 334 compels us to conclude that by enacting section 334.041 the legislature intended to provide municipalities with almost unlimited discretion and authority to "acquire, sell, lease, convey, or otherwise dispose of" approved venue projects, or portions thereof.

Hill argues that the second sentence of section 334.041(b) shows the legislature intended that the venue project property continue to be used for the dedicated purpose, despite any conveyance under subsection (b).  The second sentence provides that, in a subsection (b) transaction between a municipality or county and another public entity, the "public purpose" recognized in section 334.044 is adequate consideration for the transaction.  TEX. LOC. GOV'T CODE ANN. §§334.041(b), 334.044 (stating that an approved venue project is held by the municipality or county for public purposes).  Hill asserts the second sentence of subsection (b) modifies the broad powers granted in the first sentence, and clearly shows the legislature intended to authorize a municipality to convey

or dispose of an interest in an approved venue project, but *only if* the dedicated public purpose was continued. We respectfully disagree. If the legislature had intended to restrict a municipality's broad grant of power to dispose of an interest in a venue project by making it "subject to" the continuous use of the project for the dedicated purpose, it could have easily so provided. It chose not to.[7] *See Fitzgerald,* 996 S.W.2d at 866 ("it is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent"); *see also Hardee*, 70 S.W.3d at 213 (stating that if legislature wanted to exempt annexation challenges from mandamus and injunctive remedies provided for violations of Open Meetings Act, it could have done so, but did not). As noted by the Supreme Court, when courts "stray from the plain language of a statute, [they] risk encroaching on the Legislature's function to decide what the law should be." *Fitzgerald*, 996 S.W.2d at 866.

Finally, Hill makes an alternative argument that the City's actions are not authorized by section 334.041(b) because the City cannot viably "convey" a property interest to CPS since it is merely a City agency and cannot hold title to property. *See Guadalupe-Blanco River Auth. v. Tuttle*, 171 S.W.2d 520, 521, 526 (Tex. Civ. App.—San Antonio 1943, writ ref'd w.o.m., 174 S.W.2d 589) (title to the system is not vested in CPS Board, but is held by the city); *San Antonio Indep. Sch. Dist. v. Water Works Bd. of Trustees*, 120 S.W.2d 861, 865 (Tex. Civ. App.—Beaumont 1938, writ ref'd) (CPS Board is agent of the city, and its "possession" and "holding" of property for purpose of

---

[7] On the other hand, we note the legislature did choose to expressly codify the first principle of "contract with the voters" concerning the initial use of the venue tax fund. *See* TEX. LOC. GOV'T CODE ANN. § 334.042(d) (Vernon 2005) (providing, "[t]he municipality or county may use money in the venue project fund to: (1) reimburse or pay the costs of planning, acquiring, establishing, developing, constructing, or renovating one or more approved venue projects in the municipality or county; (2) pay the principal of, interest on, and other costs relating to bonds or other obligations issued by the municipality or county or to refund bonds, notes, or other obligations; or (3) pay the costs of operating or maintaining one or more approved venue projects").

supplying electricity and gas to the people is a "possession" and "holding" by the city); *see also* Tex. Att'y Gen. Op. LO-98-058, 1998 WL 457327, at *1 (1998) (utility board is agent of the city and board cannot own real property). The City responded at length, asserting that transfers of such property rights like easements and right-of-ways between the City, CPS and SAWS are distinguishable from transfers of fee simple property interests, and are proper "conveyances" of property interests under Chapter 334; it also asserted that transfers of such limited rights of access are commonplace and necessary, attaching several examples of such agreements and conveyances to its supplement to its Third Motion for Summary Judgment. We agree. The City's conveyance of a limited easement to CPS for extension of its electrical system, as occurred in this case, is distinguishable from the cases relied on by Hill because it is not a transfer of fee simple title to real property, but merely a limited right of access necessary for the utility company to fulfill its independent duty to maintain its utility system. *See City of Robstown v. Barrera*, 779 S.W.2d 83, 85 (Tex. App.—Corpus Christi 1989, no writ); *Bd. of Trustees of the City of Eagle Pass Water Works Sys. v. Deer Run Props., Inc.*, 619 S.W.2d 609, 612 (Tex. Civ. App.—San Antonio 1981, no writ).

### *Conclusion*

Given the statute's unambiguous, plain, and unrestricted language, we must conclude that there is a direct conflict between section 334.041(b) and the second principle of the common law "contract with the voters." Faced with a direct conflict, the statute controls over the common law "continuous use" concept. Therefore, the City had the authority to grant an easement to CPS across the Proposition 3 land for construction of the electrical transmission line under the specific provisions of section 334.041(b). Accordingly, we hold the trial court did not err in granting

summary judgment in favor of the City on Hill's "contract with the voters" claim, and in denying summary judgment for Hill.[8]

## ATTORNEY'S FEES

Because the City prevailed on summary judgment, the trial court awarded it $884,332 in unsegregated attorney's fees for defending against Hill's various claims.[9] On appeal, Hill asserts the City was required to segregate its attorney's fees between claims because not all the claims asserted by Hill authorized the recovery of attorney's fees – particularly, his claim for injunctive relief based on a violation of Chapter 26 of the Texas Parks and Wildlife Code. *See* TEX. PARKS & WILDLIFE CODE ANN. §§ 26.001, *et seq.* (Vernon 2002) (containing no provision for recovery of attorney's fees based on a violation of the chapter). Hill does not claim the trial court abused its discretion in awarding attorney's fees to the City, or challenge the amount of the fees as unreasonable. The City responds that (i) except for his request for an injunction, all of Hill's claims were pled as claims for declaratory relief on which attorney's fees are recoverable, and (ii) Hill's request for injunctive relief was intertwined with his substantive claims, and therefore the legal services pertaining to each need not be segregated. We apply a hybrid standard of review to the issue of segregation because it is a mixed question of law and fact. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 312-13 (Tex. 2006).

---

[8] We note, however, that the basic foundation of Hill's complaint is compelling – that at the time they approved Proposition 3 the voters had no actual notice that the City could subsequently, on its own initiative, without voter approval, convey an interest in the approved venue project to a public or private entity for a different use of the property. If the legislature believes voters should be informed, at the time they are asked to approve funding for a proposed venue project, that the municipality or county has the statutory authority to subsequently convey the venue project, or an interest in the project, for a different use without further voter approval, we suggest the legislature consider amending Chapter 334 to include that requirement.

[9] It is undisputed that the City made no attempt to segregate its attorney's fees. Further, we note that the attorney's fees were assessed only against plaintiffs Chris Hill and Gallagher Headquarters Ranch Development, Ltd.; no fees were assessed against Julie Hooper because she did not take an active role in the lawsuit.

Texas law does not permit the recovery of attorney's fees unless authorized by statute or contract. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). In *Chapa*, the Supreme Court reaffirmed the general rule requiring segregation of attorney's fees, recognizing that the exception had practically swallowed the rule. *Chapa*, 212 S.W.3d at 311-13. The Court held that intertwined facts underlying claims for which attorney's fees are recoverable and unrecoverable do not excuse a party from segregating fees between claims – "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313-14; *see Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (per curiam) (characterizing *Chapa* as holding that "a prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases"). Thus, the general duty to segregate fees applies, unless a party meets its burden of establishing that the same discrete legal services were rendered with respect to both a recoverable and unrecoverable claim. *Chapa*, 212 S.W.3d at 314; *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 455 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

In support of the fee award, the City first responds that because Hill pled all of his various claims as part of a declaratory judgment action, for which attorney's fees are recoverable by statute, it had no duty to segregate fees because they all became recoverable claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997) (authorizing award of attorney's fees in suit for declaratory judgment). However, a review of Hill's pleadings does not support that statement. Hill filed a series of amended petitions throughout the course of this lawsuit, which included many different causes of action broadly pled under the following categories: (i) "constitutional violation" of article XI, § 11 of the Texas Constitution; (ii) violations of the Texas Open Meetings Act; (iii) violation of Chapter 26 of the Texas Parks & Wildlife Code; (iv) breach of contract; (v) fraud; (vi)

application for temporary and permanent injunction; and (vii) "declaratory judgments" seeking "declaratory, injunctive and mandamus relief" from enforcement of the City Council's approval of the Project based on the various alleged statutory violations, including violations of Chapter 334 of the Local Government Code. Clearly then, Hill pled other claims besides just declaratory judgment claims, particularly claims for fraud and for injunctive relief based on various grounds. Moreover, under *Chapa*, the determining factor as to whether fees must be segregated is the type of legal services rendered with respect to the particular claims, not simply the manner of pleading or the type of claim pled. *Chapa*, 212 S.W.3d at 313-14. The test under *Chapa* is "whether *discrete legal services* advance both a claim or defense for which fees are recoverable and a claim or defense for which fees are unrecoverable . . . ." *Nguyen*, 229 S.W.3d at 455. The City's first attempt to justify the award of all its unsegregated attorney's fees fails.

The City next asserts the exception to the general duty to segregate fees, contending that all of Hill's claims were "inextricably intertwined." Based on the record before us, we cannot agree that the City met its burden of establishing the exception to the general rule. First, *Chapa* clarified that intertwined facts alone are insufficient to excuse segregation. In *Chapa* the Court expressly disavowed the prior rule that suggested that a common set of underlying facts necessarily makes all claims arising therefrom "inseparable" and thus all legal fees recoverable. *Chapa*, 212 S.W.3d at 313-14; *Varner*, 218 S.W.3d at 69 (noting that, "[i]n *Chapa*, we reestablished the rule that attorney's fees are recoverable only if necessary to recover on a contract or statutory claim allowing them, and *eliminated* the exception for fees incurred solely on separate but arguably intertwined claims") (emphasis added).

Further, the City presented no proof that the legal services rendered applied to all of Hill's claims, and could not be segregated. The City's written request for attorney's fees was supported only by affidavits; there was no testimony or other evidence presented at the hearing on attorney's fees. The affidavits by the City's attorneys summarize the total hours spent on the case by attorney time and paralegal time, describe the hourly rates charged, and the total expenses incurred. Neither of the affidavits details the actual legal work performed. Neither of the affidavits contains a statement that the legal services provided were intertwined and inseparable between claims, including those for injunctive relief. In other words, the City presented no proof to support a finding under the *Chapa* standard that the legal services provided in defending against the Chapter 26 injunction were the same as, or "inextricably intertwined" with, the legal services rendered to defend against Hill's other claims. *See Nguyen*, 229 S.W.3d at 455 (party seeking attorney's fees bears burden of demonstrating that exception to duty to segregate fees applies). Because the City failed to present any evidence supporting an exception, segregation of fees is required. Based on this record, the trial court erred in awarding the City attorney's fees for the total number of hours spent on the case. Accordingly, we reverse the award of attorney's fees and remand for a new trial on the issue of attorney's fees. TEX. R. APP. P. 44.1(b); *see Chapa*, 212 S.W.3d at 314; *see also A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007).

## CONCLUSION

Based on the foregoing reasons, we affirm the trial court's judgment in favor of the City, but reverse the award of attorney's fees to the City and remand for a new trial on attorney's fees.

Phylis J. Speedlin, Justice

-21-