# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00486-CV

---

**Rodd Frank, Appellant**

**v.**

**Metalink, L.L.C. and MTWF Properties, L.L.C., Appellees**

---

### FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-004153, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Rodd Frank appeals from the trial court's order granting Metalink, L.L.C. and MTWF Properties, L.L.C.'s (collectively, Metalink) motion for partial summary judgment and denying Frank's motion for summary judgment. We affirm.

## BACKGROUND

Metalink is a company involved in the design, manufacturing, supplying, and installing of commercial and residential custom metal fabrication. Frank was a part owner of Metalink until he resigned in January 2019. As part of the Resignation Agreement, Frank agreed to transfer his ownership of Metalink in exchange for payment. Specifically, Metalink agreed to (1) pay Frank $180,000 in cash, (2) release Frank from his prior non-compete covenant, (3) assign

Frank title to his Metalink company truck, and (4) provide Frank with health benefits through the end of January 2019. The Resignation Agreement states in relevant part: [1]

> 2. In consideration for Frank's resignation and assignment of membership interest, MTWF/Metalink shall release Frank from, and waive the enforcement of the covenant not to compete set forth in the first sentence of Section 17(a) of that certain Asset Purchase Agreement dated March 10, 2016 between MTWF Holding, LLC, now known as Metalink, LLC, Metalink Corporation, Mariko Harp and Rodd Frank. Frank agrees not to solicit for employment, hire, or do business with, Metalink employees for a period of two (2) years after the date of this agreement. Frank acknowledges that MTWF/Metalink would not have agreed to enter into this agreement if Frank had not agreed to the foregoing restrictive covenant. Additionally, we will transfer title to you for your company truck and provide you with health benefits through January, 2019 and pay you $180,000 cash. The total value of this package exceeds $195,000.00 vs. the ± $65,000.00 you would be entitled to under contract.

A portion of the $180,000 cash payment to Frank included $65,184.49 for Frank's ownership interest based on the formula set out in Metalink's Company Agreement.[2] According to testimony from Metalink's president, per the valuation formula, Frank's ownership interest as of the date of his separation was $65,184.49. This number was calculated from Frank's $57,200 cash contribution plus 5% simple interest over his 1,019-day affiliation with Metalink. Additionally, as part of his consideration, Frank agreed not to "solicit for employment, hire, or do business with, Metalink employees" for a period of two years ending in January 2021.

---

[1] The only version of the Resignation Agreement entered into the record is one that contains the shown annotations. It is unclear as to which individual or party is responsible for the annotations.

[2] MTWF Holding, LLC, and MTWF Properties, LLC, collectively form Metalink and each has its own company agreement; we refer to both of their respective, identical, company agreements collectively as the "Company Agreement."

2

The summary judgement evidence established that Metalink paid Frank $180,000, and after he left Metalink, he started a competing business called Presidio Custom Metal Works (Presidio). A year after his resignation, in February 2020, Frank hired Jimmy Rosales as an employee at Presidio. The evidence was undisputed that Rosales worked at Metalink at the time of Frank's resignation. Frank admitted at his deposition that the Resignation Covenant covered any person employed by Metalink "as of the date of [the Resignation Agreement]," regardless of whether that person separated from Metalink's employment during the restriction period. Frank allegedly told Rosales to "wait a few months" before coming to work for Frank. In May 2020, Frank emailed then-current Metalink employee Toni Dietrich asking her for details of Metalink's pricing for one of its previous bid-winning jobs. Dietrich responded with a breakdown of Metalink's bid pricing. Frank contacted Dietrich once more in July 2020, asking for information on a Metalink customer and the price Metalink paid for its subcontractor that it used for almost all of its apartment construction projects. Dietrich provided the information, which contained Metalink's costs, profit margins, expenses, sales prices, vendor costs, and bids on three projects for one of Metalink's largest customers.

Metalink filed the underlying suit against Frank for breach of contract and trade secret misappropriation, alleging that Frank's solicitation and hiring of Rosales and solicitation of Dietrich were a breach of the Resignation Covenant. Metalink sought attorneys' fees under the contract and the Texas Uniform Trade Secrets Act (TUTSA). *See* Tex. Civ. Prac. & Rem. Code §§ 134A.001–.008. Frank filed a counterclaim against Metalink for attorneys' fees under the Act. Metalink filed a traditional motion for partial summary judgment on its breach-of-contract claim, and Frank filed a traditional motion for summary judgment on Metalink's breach-of-contract claim and a no-evidence motion on the TUTSA claims.

3

The trial court denied Frank's motion in its entirety, granted Metalink's motion, and dismissed Metalink's remaining claims for damages and fees under the Texas Uniform Trade Secrets Act (TUTSA). *See* Tex. Civ. Prac. & Rem. Code §§ 134A.001–.008. The trial court rendered final judgment and awarded Metalink $114,815.51 in restitution damages plus interest and attorneys' fees. Frank timely appealed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion for summary judgment de novo. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). We must take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, the appellate court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, render the judgment that the trial court should have rendered. *See FM Props. Operating Co.*, 22 S.W.3d at 872. When the trial court does not specify the grounds relied upon in granting the motion for summary judgment, the reviewing court must affirm if any of the summary judgment grounds are meritorious. *Id.*

## ANALYSIS

Frank asserts eleven issues on appeal, which we have grouped into six issues: (1) whether the Resignation Covenant constituted an unreasonable restraint of trade under Texas Business and Commerce Code Sections 15.50 (Criteria for Enforceability of Covenants Not to Compete) and 15.51 (Procedures and Remedies in Actions to Enforce Covenants Not to Compete),

4

*see* Tex. Bus. & Com. Code §§ 15.50, 15.51; (2) whether the value of the Resignation Covenant was properly formulated; (3) whether a fact issue exists regarding Frank's alleged solicitation of Rosales; (4) whether restitution was a proper award of damages; (5) whether the declaration of Metalink President William McKean was admissible; and (6) whether the trial court's award of attorneys' fees was proper.

### 1. Whether the Resignation Covenant was enforceable

On appeal, Frank argues that the Resignation Covenant is an unreasonable restraint on trade because Metalink had no reasonable, legitimate business interest in preventing Frank from hiring *former* Metalink employees. Frank argues that this is an unreasonable restraint on scope of activity under the Texas Business and Commerce Code and thus renders the Resignation Covenant unenforceable as a matter of law. [3]

"A covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations

---

[3] On appeal, Frank does not challenge the Resignation Covenant's lack of express geographic limitation. Instead, he argues that it is unenforceable because the "scope of activity to be restrained" is unreasonable. Metalink argues that Frank waived his challenge on appeal to the covenant's enforceability based on this theory because Frank did not assert it in either his motion for summary judgment or his response to Metalink's motion for partial summary judgment. Instead, Metalink argues, Frank asserted this theory of unenforceability for the first time in his reply brief to his motion for summary judgment, which was filed only one day before the motion for summary judgment hearing. We decline to consider Frank's issue waived because one of his grounds for summary judgment was that the Resignation Covenant was unenforceable based on Section 15.50 of the Texas Business and Commerce Code, thus preserving for appeal any of the statute's bases for unenforceability. *See* Tex. Bus. & Com. Code § 15.50; *see First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017) ("In considering assertions that claims have been waived, we have urged courts of appeals, and reminded ourselves, to construe briefing 'reasonably, yet liberally, so that the right to appellate review is not lost by waiver.'").

as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *See* Tex. Bus. & Com. Code § 15.50. Whether a restrictive covenant is a reasonable restraint on trade is a question of law for the court. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990). In signing the Resignation Agreement, Frank agreed not to "solicit, hire, or do business with" persons employed by Metalink as of the date of the Resignation Agreement or at any given time during the stated two-year period. Metalink argues that the solicitation prohibition and the no-hire prohibition serve the same legitimate business purpose—retaining Metalink employees—and that those specific portions were reasonable restraints because Frank could solicit, hire, or do business with any other person other than Metalink's employees.

"Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete." *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 164 (Tex. App.—Tyler 2016, no pet.). Here, Metalink argues it had a legitimate business interest in retaining its employees, and points out that Frank was not precluded from contacting former or current Metalink clients, former Metalink employees, or any other person in the business of commercial and residential construction. Rather, he was precluded from soliciting, hiring, or doing business with people who were Metalink employees at the time the Resignation Agreement was signed.

Using Rosales as an example, Frank argues that the Resignation Covenant is unreasonable because it prohibits Frank from soliciting, hiring, or doing business with any individuals who worked at Metalink at the time the Resignation Agreement was signed in January 2019 and that Metalink could not suffer "loss of good will or other business interest" from

Frank allegedly doing business with Rosales when Rosales had already separated from Metalink on his own volition. But Frank does not provide, nor can we find, any authority that distinguishes between resignation covenants as they apply to individuals working for a company during the prohibited period and individuals employed at a company *at the time* the aggrieved party agreed to the covenant. Regardless, the record shows that the Resignation Covenant did not restrict Frank from opening his own competing business upon separation from Metalink—which is what he did when he created Presidio. Under our view, without the non-solicitation clause, it is reasonable to conclude that Metalink employees would be incentivized to leave Metalink if they were presented with an employment offer from a competitor—such as Frank. Metalink's summary judgment evidence included the fact that Metalink is a small company made up of about 41 employees. [4] Thus, given Frank's ability to set up a competing business and Metalink's small size, we cannot conclude that a prohibition on soliciting for employment, hiring, or doing business with any of Metalink's employees for two years poses a greater restraint than is necessary to protect Metalink's legitimate business interest of maintaining its employees. *See* Tex. Bus. & Com. Code § 15.50; *see Smith v. Nerium Int'l, LLC*, No. 05-18-00617-CV, 2019 WL 3543583, *8 (Tex. App.—Dallas Aug. 5, 2019, no pet.) (mem. op.) (holding that employer had legitimate business interest in retaining salesforce); *see also Everett Fin. Inc. v. Primary Residential Mortg., Inc.*, No. 3:14-CV-1028-D, 2016 WL 7378937, at *9 (N.D. Tex. Dec. 20, 2016) (holding that employee non-solicitation covenant extending to all current employees is reasonable protection of employer's interest in maintaining employees); *Merritt Hawkins & Assocs. v. Gresham*,

---

[4] McKean provided deposition testimony that, at the time of the deposition, Metalink currently employed 41 individuals and that on a given year that number can fluctuate from between 39 to 52.

79 F. Supp. 3d 625, 639–40 (N.D. Tex. 2015) *aff'd sub nom. Merritt Hawkins & Assocs. v. Gresham*, 861 F.3d 143 (5th Cir. 2017) (holding that prohibition on employment-related communications with former employer's employees for three years after employee left employer was not unreasonably broader than necessary to protect employer's legitimate interests when agreement did not prohibit all communications, but only those related to solicitation, recruiting, or inducing other employees to terminate employment); *C.f. Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 WL 261038, at *8 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.) (holding non-solicitation covenant unreasonable and beyond what was necessary to protect company's goodwill and other business interests where employee was barred for two years from soliciting or employing both company's current and former employees when company employed approximately 14,000 nationwide, including some internationally).

For these reasons, we conclude that the Resignation Covenant's restraint on solicitation, hiring, or doing business with Metalink employees does not render the Resignation Covenant unreasonable as a matter of law and was thus enforceable by Metalink against Frank. We overrule Frank's first issue.

### 2. *Whether McKean's declaration was admissible*

We next consider Frank's issue that the declaration of William McKean, Jr. was inadmissible. As part of its summary judgment evidence, Metalink submitted a declaration from McKean, who was Metalink's President. The declaration largely reiterated the allegations that formed Metalink's petition, including the valuation and calculation behind the Resignation Agreement, what the Resignation Covenant required of Frank, and how Frank violated it by soliciting and doing business with Metalink employees Toni Dietrich and Jimmy Rosales. Frank

lodged objections to the declaration in the trial court, arguing that (1) McKean made a reference to a "cease-and-desist-letter" without including the letter itself, thus violating the best evidence rule, and (2) McKean's allegation that Frank solicited Metalink employees was conclusory and not supported by attached evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex. 1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1; *Owens–Corning Fiberglas Corp.,* 972 S.W.2d at 43. Texas Rule of Evidence 1002—also known as the "best evidence rule"— provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or other law provides otherwise." *See* Tex. R. Evid. 1002. "The rule does not apply unless a party is seeking to prove the contents of a document." *DeSoto Wildwood Dev., Inc. v. City of Lewisville*, 184 S.W.3d 814, 828 (Tex. App.—Fort Worth 2006, no pet.).

It is undisputed that Metalink's cease-and-desist letter was not entered into evidence by either party. However, Metalink never tried to prove the contents of the letter; rather, McKean's affidavit simply references its existence. We therefore conclude that the best evidence rule is not implicated because neither the existence of a cease-and-desist letter nor its contents directly affect whether Frank violated the Resignation Covenant; in order words, the letter is not essential to proving any of Metalink's claims. *See County of El Paso v. Aguilar*, 600 S.W.3d 62, 78 (Tex. App.—El Paso 2020, no pet.) ("The best evidence rule does not apply in the absence of a dispute concerning the subject document's content."). Furthermore, Metalink argues, and we agree, that any error in admitting McKean's declaration against Frank's objections was harmless because it is cumulative of other admissible evidence on the breach-of-contract claim, which is

9

discussed below.  *See Rader v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00052-CV, 2011 WL 2437679, at *4 (Tex. App.—Austin June 15, 2011, no pet.) (mem. op.) (providing that erroneous admission of evidence is not harmful if evidence is merely cumulative).  We overrule this issue.

3.  *Was there a genuine issue of material fact as to Metalink's claim that Frank solicited Jimmy Rosales in violation of the Resignation Covenant?*

In his summary judgment response and on appeal, Frank argues there is a genuine issue of material fact as to whether he solicited Rosales to leave Metalink in order to work for Presidio.

The operative language of the Resignation Covenant stated that Frank agreed not to "solicit, hire, or do business with persons employed by Metalink as of the date of the Resignation Agreement or at any given time during the two-year restriction period."  Our review of the record shows that Metalink's summary judgment evidence on this claim included the following:  Rosales' deposition testimony that Frank paid him via a check made out to "Jimmy Rosales"; Rosales' deposition testimony that he is the sole proprietor of his company, Kyros Fence; that Kyros Fence is not a separately registered entity; and Frank's own admissions, including Frank's testimony that: Frank understood when the 2-year period began and ended, Frank reached out to Rosales during this 2-year period, Frank knew that Rosales worked for Metalink at the time he reached out to him in February 2020, and that Frank admitted to paying Rosales for his work for Presidio during the prohibited 2-year time period.

In his summary judgment response and on appeal, Frank argues that a fact issue exists as to whether Frank breached the Resignation Covenant because he never solicited—or otherwise reached out to—Rosales to work for Presidio.  But even if there is a dispute as to this, it

10

is not material. This is because the Resignation Covenant prohibited Frank from not only soliciting Metalink employees for two years but also from *doing business* with them during the prohibited 2-year period. Frank admitted to doing business with Rosales during the prohibited 2-year period.

> Q: (Metalink's attorney): So you began conducting business with Kyros Fence, Jimmy Rosales in February of 2020?
>
> A: (Frank) Yes.

Frank also points to his evidence that Rosales admitted that he began working for Frank and Presidio in February 2020, approximately two months after he separated from Metalink. This too, is immaterial, as the Resignation Covenant, as written, applies to any person employed by Metalink "as of the date of [the Resignation Agreement]," regardless of whether that person separated from Metalink during the prohibited 2-year period. Thus, we conclude Metalink's evidence established that Frank conducted business with Rosales in violation of the Resignation Covenant and that Frank did not present contrary evidence to raise a genuine issue of material fact on Metalink's breach-of-contract claim. We overrule this issue.

### 4. Was the value of the Resignation Covenant properly formulated?

Frank argues that the valuation of the Resignation Covenant (i.e. what Metalink argues is $114,815.51) violates the parol evidence rule because the amount is not recited in the Resignation Agreement. He argues that the Resignation Agreement does not mention $114,815.51 as compensation for the Resignation Covenant or anything else. He claims that Metalink relies on parol evidence in the form of McKean's declaration that states the sole consideration for the Agreement was the $180,000.00 cash payment.

11

"When parties have entered into a valid, written, integrated contract, the parol evidence rule precludes enforcement of any prior or contemporaneous agreements." *First Bank v. Brumitt*, 519 S.W.3d 95, 109 (Tex. 2017) (cleaned up). Here, while we note that the $114,815.51 number does not appear in the Resignation Agreement, it was formed through the formulas set out in the Company Agreement. The Resignation Agreement states:

> [Metalink] will transfer title to [Frank] for [Frank's] company truck and provide [Frank] with health benefits through January, 2019 and pay [Frank] $180,000 in cash. The total value of this package exceeds $195,000.00 vs. the +- $65,000 [Frank] would be entitled to under the contract.

The Resignation Agreement explains the "± $65,000" value of Frank's membership interest and plainly refers to the methodology for deriving that value "under contract." Metalink's president William McKean testified—and Frank did not dispute—that Frank's ownership interest was $65,184.49, calculated using the valuation formula in paragraph 7.4 of the Company Agreement, which states:

> 7.4  Options to Purchase. If a person Disposes or attempts to Dispose of Units in violation of this agreement ("Breaching Member"), the company will have an option, exercisable at any time, to purchase those Units. If the company exercises an option, the purchase price and terms of payment will be the lesser of (i) the total cash contributed to the company by the Breaching Member, plus 5% simple interest annually from the time of such contribution until the closing; or (ii) the book value of the company's assets minus the liabilities as reflected in the company's most recent balance sheet multiplied by a fraction the numerator of which is the number of Units held by the Breaching Member and the denominator of which is the number of Units held by all members.

Using this formula, McKean testified that Frank's $57,200 cash contribution plus 5% simple interest over his 1019-day affiliation with Metalink comes out to $65,184.49. Subtracting this

number from the cash payment to Frank ($180,000) comes out to $114,815.51 for the value of the Resignation Covenant. Frank confirmed this valuation in his deposition:

> Q: (By [Metalink's attorney]) All right. So let's go back to 7.4 the calculation we had here. Do you dispute under Paragraph i, 7.4 that the value of your interest was roughly $65,000.
>
> A: (Mr. Frank) No.
>
> Q: Okay. So you would agree that that is a proper calculation based on interest and your contributions?
>
> A: Yes, based on 7.4.

The Resignation Agreement's references to Frank's ownership interest (i.e. "± $65,000") operate to incorporate the Company Agreement's valuation formula into the Resignation Agreement. *See Alford v. McKeithen*, No. 12-14-00262-CV, 2016 WL 1253902, at *2 (Tex. App.—Tyler Mar. 31, 2016, no pet.) (mem. op.) (providing that separate agreements may be incorporated by reference into signed contract and that "the language used to incorporate a document is not important provided the signed document plainly refers to the incorporated documents"). We conclude that the valuation of the Resignation Covenant is not dependent upon any prior or contemporaneous agreement, *Brumitt*, 519 S.W.3d at 109, and accordingly, its value is not parol evidence, but rather the mathematical difference between the cash payment to Frank and his ownership interest. Frank has provided no other evidence that the parties entered into any other type of agreement outside the contract that would affect the valuation of the Resignation Covenant. Therefore, we reject Frank's argument that its value is barred by the parol evidence rule and conclude that the value was properly formulated. We overrule this issue.

*5. Was restitution the proper measure of damages?*

Frank challenges the trial court's restitution award to Metalink in the amount of $114,815.51 on several grounds, arguing that (1) restitution was not the proper measure of damages since it put Metalink in a better position than had they never entered into the Resignation Agreement in the first place, (2) restitution was not the proper measure of damages because Metalink failed to introduce any evidence that their expectation damages were too difficult to calculate, and (3) restitution was not proper because the Resignation Agreement assigns no value to the Resignation Covenant (as discussed *supra*).

First, Frank cites *Phillips v. Phillips* to support his position that the award to Metalink was a windfall and put them in a better place than they had been previously. 820 S.W.2d 785 (Tex. 1991). The court in *Phillips* held that a purported liquidated damage clause was an unenforceable penalty because it required a breaching party to pay to the non-breaching party "ten times the amount she loses as a result of such breach[]" and that this provision violated both requirements for an enforceable liquidated damages stipulation. *Id.* at 787. We cannot conclude that *Phillips* is applicable here, given nowhere in the Agreement is a reference to a liquidated damages clause. Here, by contrast, the measure of damages was the actual minimum value of Frank's breach of the Resignation Covenant, not a multiple of that value. When Frank resigned, Metalink paid him a minimum of $114,815.51 for the value of the Resignation Covenant; in other words, Metalink paid Frank $114,815.51 to comply with the terms of the Resignation Covenant. In finding that Frank breached it, the trial court awarded Metalink this same amount in damages.

Second, Frank argues that restitution is only available when a party's expectation damages are too hard to measure, and that Metalink made no effort to calculate actual damages

from the alleged breach of the contract. He argues that restitution is only available as part of the equitable remedy of rescission, and not as a measure of legal damages for breach of contract. Metalink responds that restitution is a common form of contract damages and was appropriate to compensate Metalink for Frank's breach. We agree with Metalink. "American law traditionally recognizes three types of recovery to compensate for a breach of contract: expectancy, reliance, and restitution damages." *Atrium Med. Ctr., LP v. Houston Red C, LLC*, 595 S.W.3d 188, 193 (Tex. 2020). In cases where the aggrieved party's expectation damages are too difficult to measure, restitution for unjust enrichment is often an appropriate measure of recovery. *See City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 317 (Tex. App.—Austin 1992, no writ) ("Unlike other contractual damages, restitution focuses on forcing the defendant to disgorge benefits that it would be unjust to keep, rather than on compensating the plaintiff . . . [t]he principle that underlies the remedy of restitution is the avoidance of unjust enrichment . . . [t]he principle, once again, is to deprive the defendant of benefits that in equity and good conscience he ought not to keep.") (cleaned up). Accordingly, we conclude that the trial court's award of restitution damages was a proper award of damages for Frank's breach and thus the trial court did not err in granting Metalink's motion for summary judgment on this ground.

6. *Whether the trial court's award of attorneys' fees was proper*

Frank challenges the trial court's award of attorneys' fees, arguing that Metalink failed to segregate fees related to its trade secret claims under TUTSA (which the trial court dismissed with prejudice) and the fees related to the breach-of-contract claim (on which the court granted summary judgment). Metalink responds that the attorneys' work performed on the trade

15

secret claims were "inextricably intertwined" with the breach-of-contract claim, thus justifying the recovery of attorneys' fees for the entire case.

"Generally, a party seeking attorney's fees must show that the fees were incurred on a claim that allows recovery of such fees, and must segregate fees incurred among different claims or separate parties." *Anderson Mill Mun. Util. Dist. v. Robbins*, No. 03-04-00369-CV, 2005 WL 2170355, at *7 (Tex. App.—Austin Sept. 8, 2005, no pet.) (mem. op.). The Texas Supreme Court has held that intertwined facts underlying claims for which attorney's fees are recoverable and unrecoverable do not excuse a party from segregating fees between claims, explaining "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006). Thus, a party seeking recovery of attorney's fees has a duty to segregate fees unless that party meets its burden of establishing that the same discrete legal services were rendered with respect to both a recoverable and unrecoverable claim. *Id.* at 314. Whether a prevailing party must segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13. The party seeking to recover attorney's fees carries the burden of demonstrating that fee segregation is not required. *See Hong Kong Dev., Inc. v. Nguyen,* 229 S.W.3d 415, 455 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

Here, the trial court dismissed Metalink's TUTSA claim, meaning Metalink may only recover attorneys' fees for that claim if their legal services provided for the TUTSA claim were "inextricably intertwined" to the breach-of-contract claim. Metalink argues that Frank's unlawful hiring of Jimmy Rosales in violation of the Resignation Covenant pertains only to Metalink's breach-of-contract claim (for which attorneys' fees are recoverable under Texas Civil

16

Practice and Remedies Code § 38.001 and the Resignation Agreement itself), and that Frank's unlawful inducement of Toni Dietrich to provide him Metalink's pricing information was actionable under TUTSA *and* a breach of the Resignation Covenant. Accordingly, Metalink argues, any legal work done to develop Metalink's TUTSA claim was also allocable to its breach-of-contract claim and recoverable under the "inextricably intertwined" exception to the fee segregation rule. Frank responds that neither Metalink's original petition nor summary judgment motion alleged that Frank's interactions with Toni Dietrich breached the Resignation Covenant and therefore they "cannot advance the theory here." Based on our review of the record, we disagree. Metalink's original petition alleges that Frank solicited Dietrich to obtain information on Metalink's confidential bid information and that these actions formed the basis for Metalink's two causes of action: breach of contract under the Agreement and violation of TUTSA. Specifically, Metalink's original petition states: "Frank used his personal relationship with Dietrich to knowingly obtain confidential, trade secret information without Plaintiffs' consent, with the express purpose of using that information to win bids on jobs Metalink was also bidding on. He also used Dietrich to steal confidential job opportunities." While it is undisputed that these allegations form the basis of Metalink's TUTSA claim, Metalink's original petition shows that they also form part of the basis for the breach of contract claim. Under the "Causes of Action" heading, the petition states:

> **Breach of Contract**. Plaintiffs and Frank entered the Agreement whereby Frank would transfer ownership of Metalink and MTWF and agree to a non-solicitation agreement for two years in exchange for payment. Plaintiffs fully performed the contract by paying Frank in accordance with the Agreement. *Frank breach[ed] the agreement by soliciting Plaintiffs' employee for employment and for trade secret information.* Plaintiffs has been injured in the amount of $114,901.70, the consideration Plaintiffs paid for the non-

17

solicitation agreement, which Plaintiffs have been deprived any and all value.

(emphasis added). In its motion for partial summary judgment, Metalink argues: "Frank breached the Resignation Agreement by soliciting Plaintiffs' employees and doing business with them." Regarding Frank's interactions with Dietrich, the motion states:

> Finally, Metalink discovered the extensive ways Frank continued to communicate with its employees. In 2020, Frank convinced an existing Metalink employee to send him confidential pricing information for one of Metalink's best customers . . . *In response to Frank's solicitation*, Dietrich took confidential apartment line item breakdowns and used Metalink's scanner to scan them to her email on July 9, 2020, at 5:55 pm, and then immediately forwarded them to Frank at 5:59 p.m.

We read the petition and summary judgment motion together as evidence that Metalink viewed Frank's communications with Dietrich as a prohibited "solicitation" under the non-solicitation clause, thus resulting in a breach of the Resignation Covenant (i.e. the breach-of-contract claim). Accordingly, under our view, Metalink sufficiently alleged that Frank's interactions with Dietrich breached the Resignation Covenant and may therefore argue the same on appeal.

In addition, Metalink's lead attorney James Egbert provided a declaration asserting that a reasonable fee for the necessary work performed in this case amounts to $34,483.87, along with an attachment showing a breakdown of the legal work performed by the firm's attorneys and hours billed. Although not a requirement to meet its burden to avoid segregation of fees, several entries in Metalink's billing records can be categorized into separate claims (i.e. "Review and analyze correspondence and email between Toni Dietrich and Rodd Frank," "Review documents sent by Dietrich to Frank," "Attend and conduct sworn interview of Deitrich [sic]"), thereby providing the trial court additional insight and detail into the work performed. *See CA Partners*

18

*v. Spears*, 274 S.W.3d 51, 82 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (even when fee segregation is required, attorneys need not keep separate records documenting exact time spent pleading one claim versus another) (citing *Chapa*, 212 S.W.3d at 314). Thus, because the prosecution of Metalink's TUTSA and breach-of-contract claims both necessitated the same work by the attorneys, we conclude that Metalink was not required to segregate its attorneys' fees. *But see Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 269 S.W.3d 628, 643 (Tex. App.—San Antonio, 2008, pet. granted, judgm't vacated w.r.m.) (reversing and remanding for hearing on attorney's fees where affidavits failed to detail actual legal work performed and failed to contain statement that legal services provided were intertwined and inseparable between claims, including those for injunctive relief). Based on the record before us, we conclude that Metalink conclusively established that both claims were inextricably intertwined and therefore Metalink was not required to segregate its fees.

Finally, Frank argues that Metalink did not provide sufficient evidence of Metalink's attorneys' qualifications. Specifically, he states that Egbert's declaration only lists his own experience and fails to do the same for the other attorneys who worked on the case. A claimant seeking attorney's fees must provide sufficient evidence that the fees are both reasonable and necessary. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 489 (Tex. 2019). This evidence includes: (1) the particular services performed, (2) who performed them, (3) when they were performed, (4) the reasonable time required, and (5) the reasonable hourly rate for each person performing them. *Id.* Here, Egbert's affidavit states that he has been a licensed attorney since 2014, he is familiar with the usual, reasonable and customary fees for representation in civil litigation at the trial and appellate level for South Texas and in Texas in general, and that in his opinion, a reasonable and customary fee for representation in a case such

19

as this on an hourly basis would be between $200 and $500 per hour based upon the factors approved by the Texas Supreme Court in the case *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997). Relating to fees incurred, Egbert's affidavit generally avers that the firm's work included "communicating with Metalink, reviewing relevant documents, interviewing fact witnesses, preparing the petition, preparing discovery, responding to discovery, reviewing document production, communicating with opposing counsel, and time spent preparing this Motion to which this Affidavit is attached" and that "[a]ll work corresponding to these fees was necessary to pursue recovery in this matter." The billing records attached to the affidavit show an itemized list by date of the services provided, by whom, and the corresponding hourly rates of each individual performing the services. While evidence of the other attorneys' reasonable hourly rate and qualifications are not included in Egbert's affidavit, a link to the firm and its attorneys' qualifications are nevertheless referenced in Frank's attorney's declaration as part of Frank's objection to the inclusion of the paralegal's billed hours ("I have reviewed the website of the firm retained by Plaintiffs in this case at www.brandscomblaw.com/lawyers/ that purports to include all of the Firm's lawyers. There is no listing for a Heather Evans."). Furthermore, Frank does not cite, nor can we find, case law indicating that Egbert's statement that "a reasonable and customary fee for representation in a case such as this on an hourly basis would be between $200 and $500 per hour" is insufficient as a means of asserting reasonable hourly rates. *See Eichhorn v. Eichhorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *14 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.) (upholding trial court's award of attorneys' fees where attorney briefly testified why hours worked were reasonable and necessary even though attorney failed to provide rate of unknown timekeeper or testimony as to why that person's hourly rate was reasonable and stating that "[t]he testimony did not address [unknown timekeeper] or why that person's hourly rate is

20

reasonable . . . [b]ut even removing fees attributable to [unknown timekeeper] from the fee claim, Sarah still offered evidence of $27,180.00 in attorneys' fees charged by her counsel's firm for her counsel's work. His testimony and the exhibit together referred to the tasks that he performed and the time it took him to perform them as reasonable and necessary, and the exhibit shows generally what the tasks were and when he performed them. Counsel's testimony and the exhibit together set forth sufficient evidence for a lodestar claim of $27,180.00 in attorneys' fees, which was thus a presumptively reasonable amount of fees for the trial court to award."); *see Anastasi v. McHorse*, No. 03-23-00274-CV, 2024 WL 968887, at *8 (Tex. App.—Austin Mar. 7, 2024, no pet.) (mem. op.) (upholding trial court's award of attorney's fees where attorney testified that her rate was reasonable given rates of attorneys with similar levels of experience in area and that her work was reasonable and necessary and where admitted billing records provided itemization of fees of $25,296.74, including date, amount of time spent, and work performed per entry).

Based on the foregoing, we conclude that Metalink presented sufficient evidence that its fees were reasonable and necessary pursuant to *Rohrmoos Venture*, 578 S.W.3d at 489, and that Frank did not present evidence to the contrary necessary to raise a fact issue. Thus, the trial court did not err in awarding Metalink their requested amount of attorneys' fees. We overrule Frank's final issue.

## CONCLUSION

Having overruled all of Frank's issues, we affirm the judgment of the trial court.

21

_____

Edward Smith, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed:   December 31, 2024